GREGORY NIEMIERA, II, AN INFANT, BY HIS NATURAL GUARDIAN, JOY NIEMIERA, AND JOY NIEMIERA AND GREGORY N. NIEMIERA, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. DR. ALAN SCHNEIDER, PRINCETON–NASSAU PEDIATRICS, P.A., AND WYETH LABORATORIES, DIVISION OF AMERICAN HOME PRODUCTS CORPORATION, DEFENDANTS-RESPONDENTS, AND PRINCETON MEDICAL CENTER, AND DENNIS DOODY, ADMINISTRATOR OF PRINCETON MEDICAL CENTER, DEFENDANTS.

Argued October 24, 1988—Decided April 13, 1989.

*Carl J. Valore* argued the cause for appellants (*Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz,* attorneys).

*Thomas J. Alworth* argued the cause for respondents Dr. Alan Schneider, et al. (*Shanley & Fisher,* attorneys).

*Lauren E. Handler* argued the cause for respondent Wyeth Laboratories, etc. (*Porzio, Bromberg & Newman,* attorneys; *Lauren E. Handler* and *Anita Hotchkiss,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

Gregory Niemiera, II is a seven-year-old child who suffered at age two months a disabling convulsive episode that left him brain damaged. Through his parents he alleges that the injuries resulted from an adverse reaction to a childhood vaccine. The central issue in his appeal is whether the "learned-intermediary" doctrine relieves the manufacturer of a childhood vaccine of the duty to warn patients directly of the vaccine's dangerous side effects. The vaccine here is DPT. Its tri-fold components protect against diphtheria, pertussis (whooping cough), and tetanus. The adverse reaction here is laid to the pertussis component of the vaccine.

The plaintiffs assert that the almost universal administration of the vaccine to infants equates with mass inoculation, an instance in which the pharmaceutical manufacturer should be held to owe an independent duty to warn patients of the danger of such adverse reactions. We disagree. The role of the physician with respect to DPT requires an exercise in medical judgment concerning when and under what circumstances the vaccine shall be administered. Hence we affirm the judgment below holding that the pharmaceutical manufacturer, Wyeth Laboratories, had no independent duty to warn of DPT's potentially catastrophic side effects.

To the extent that the pharmaceutical manufacturer is relieved of the duty to warn, the treating physician as the learned intermediary assumes a responsibility to warn the patient of the risks involved in taking the vaccine. We find that in this case, although the jury resolved all issues in the defendant-physician's favor concerning other aspects of professional treatment, the jury was not permitted to consider whether the patient was adequately informed of the risks of the vaccine. We are of course uncertain whether on that question the jury would have found in the defendant's favor as well, *i.e.*, finding the warnings either adequate or, if inadequate, not a proximate cause of the infant's condition, but we are regrettably unable to

make that decision on the basis of this record. Hence that issue must be submitted to the jury.

## I

As noted, the minor's condition is one of severe brain damage resulting from acute encephalopathy (a term identifying an illness with symptoms indicating an inflammation of the brain, but that on examination does not reveal any such inflammation) diagnosed within eight days of the inoculation with DPT. Gregory suffered convulsive seizures, which ravaged his central nervous system, and he will have impaired vision, be cerebrally palsied, and be mentally defective for the rest of his life. Plaintiff sued both Wyeth Laboratories, the manufacturer of DPT, and his physicians. (We shall refer to both Gregory and his parents as "plaintiff.")

Plaintiff contended that Wyeth Laboratories owed him an independent duty to warn that DPT had potentially devastating side effects—among them, brain damage and death.[1] Plaintiff's mother, although she was a nurse, testified, as did her husband, that she knew of no such possible side effects of what she thought was a routine "well-baby" inoculation against childhood diseases. Before trial, Wyeth Laboratories succeeded in its pretrial motion to dismiss plaintiff's complaint for failure to warn on the basis of the "learned intermediary" doctrine. We shall discuss that aspect of the judgment in Part III of this opinion.

---

[1] Plaintiff did not initially assert that DPT was unsafe because of design or manufacture. During the course of the trial he offered some proof that a safer vaccine was available, but did not contend that the vaccine was unfit for its intended use. Under *Restatement (Second) of Torts* § 402A comment k (1965) it is recognized that some products are unavoidably unsafe but may be rendered safe for use if adequate warnings are furnished. After the trial court dismissed the failure-to-warn claim against Wyeth, plaintiff sought leave to amend his complaint to assert that a safer alternative vaccine could have been marketed. The trial court refused to reopen the claim against Wyeth. The Appellate Division left that issue undisturbed as do we.

At trial, plaintiff presented four bases of professional responsibility to be assessed against the physician: (1) failure to warn of the vaccine's side effects; (2) failure to heed the contraindications in the child's condition prior to administering the vaccine; (3) failure to treat when the early adverse symptoms were disclosed; and (4) failure to treat properly when the symptoms escalated.

The trial thus focused on many complex issues that are not before us for resolution. Even if the doctor were negligent, the jury had to consider the more fundamental underlying question of whether DPT was the cause of his resulting condition. There was surely enough evidence in the case for the jury to have found that an independent condition such as a urinary tract infection might have caused the convulsions and disorders that left Gregory permanently brain damaged. The jury did answer a special interrogatory finding that the physician had not been negligent.

## II

The claim arises from a routine "well-baby" visit of Gregory Niemiera to his pediatrician on April 5, 1982. Gregory was then approximately ten weeks old. He was a nursing baby and thus ordinarily more immune to infectious diseases. On an earlier visit, February 17, 1982, he had presented a slight eye discharge. Plaintiff claims that on the April 5 visit Gregory still had the discharge from his eyes. Dr. Schneider, his pediatrician, examined the baby on April 5 and considered his medical history. In his opinion, it was safe to administer the DPT vaccine. Dr. Schneider testified that his usual routine was quickly to review personally "the fact that the baby was of the age to be given the immunization, [and] to review the usual side effects and precautions" before sending the child for a shot. Normally he would also advise the mother of typical post-shot reactions including irritability, redness and swelling at the area of the injection, and possibly a fever. Finally, he would tell the

mother that the baby could be given Tylenol to treat any fever or irritability. He could not recall whether he followed that procedure in this case. It was not disputed that subsequent to the inoculation, Mrs. Niemiera received from the administering nurse a printed paper describing these as possible post-shot reactions to the treatment. As was the doctor's custom, he left the actual administration to a nurse.

According to Mrs. Niemiera, on April 7, 1982, she called Dr. Schneider's office because Gregory was not nursing and was still running a low-grade fever. Although mild fever is a typical post-shot reaction, she was disturbed that he was still running a fever two days after the inoculation. Dr. Schneider was not in, but later that day Dr. Formalont, a partner of Dr. Schneider's, returned the call. By Mrs. Niemiera's account, Dr. Formalont advised her that she should not be concerned because Gregory was probably just suffering from a flu. The entire incident was disputed by Dr. Schneider who claimed that according to his office records Dr. Formalont was not working that day and therefore would not have returned the call.

Mrs. Niemiera also testified that she called Dr. Schneider's office again on April 9, 1982, because the baby's condition had worsened. Gregory was now vomiting, crying uncontrollably, and still did not want to eat. Dr. Schneider prescribed pedialyte, a medication to replace body fluids, and told Mrs. Niemiera to call again if Gregory had blood or mucus in his stool. This phone call was received by Dr. Schneider and noted in his office chart. Neither Dr. Schneider, Dr. Formalont, nor any other member of the Princeton–Nassau Pediatric Group examined Gregory on April 7 or April 9. According to plaintiffs, on Saturday, April 10, Gregory's condition was "a little bit better," and by Sunday morning, April 11, he was "pretty good." That day was Easter Sunday. Gregory was taken to church and to family dinner. It was Gregory's last day of normal childhood.

On the morning of Monday, April 12, 1988, Mr. and Mrs. Niemiera awoke to find Gregory lying on his stomach. His crib

was full of his waste. He was unresponsive, running a high fever, and suffering periodic seizures. At one point he stopped breathing. The Niemieras rushed Gregory to the Princeton *Medical Center* where he was seen by Dr. Schneider. Later he was transferred by ambulance to Children's Hospital of Philadelphia (CHOP) where he received "intensive and extensive" treatment. While at CHOP Gregory was diagnosed as having acute encephalopathy resulting in severe and permanent brain damage.

The exact cause of the convulsive illness was disputed. Early infusion of antibiotics, to prevent bacterial disorder, and the loss of early blood specimens make difficult an expert determination of cause. There was an infection in Gregory's bladder, but plaintiff's expert said that might have been a result, not a cause, of the child's bowel movements. At one time Dr. Schneider, the pediatrician, had rendered an opinion that the episode was caused by the vaccination.

Plaintiff's expert witness believed that Gregory's brain damage was caused by an adverse reaction to the DPT vaccine. He testified that it is normal for a child to receive the DPT vaccine several times in his early years, and that the symptoms of an adverse reaction to the initial inoculation may be different from an adverse reaction to subsequent inoculations. He claimed that the progress of the symptoms in this case, particularly the intermittent fever, were not inconsistent with a pertussis reaction to an initial DPT vaccination. He admitted, however, that ordinarily any severe adverse reaction, such as convulsions, occurs within seventy-two hours. Dr. Schneider and his expert contended that Gregory's symptoms were unrelated to the DPT shot, but were in fact caused by some independent medical illness, possibly the urinary tract infection.

Gregory's expert testified that good medical practice requires that a patient be informed of the symptoms that would indicate a potentially-catastrophic adverse reaction to the Pertussis vaccine. In his view, "it needed to be spelled out more clearly,

then one would have to say, this could cause a real problem in the brain and nervous system, and these are things you must watch." The "things you must watch" include severe and inconsolable crying, intermittent high fever, and loss of appetite. It should also include the fact that, at least with the initial DPT vaccination, symptoms of a bad reaction may disappear and reappear over several days, and that the presence of these symptoms should be immediately reported to a doctor. (The information sheet that Mrs. Niemiera received instructed her only to report any symptoms at the next visit to the doctor.) The onset of the disease is not irreversible, he said, and an informed patient, particularly one such as Joy Niemiera, might well have saved her child's life by heightening her reaction to the medical signals.

The defendant-physician moved to dismiss plaintiff's failure-to-warn claim at the close of all the evidence and before the case went to the jury. He relied on two theories for the dismissal. (We adopt for convenience the expressions "pre-shot" and "post-shot" used by defendant's attorney.) He argued that there was no causal connection between the pre-shot failure to warn and the resulting injuries because (1) the plaintiff's mother had not testified that she would have foregone the inoculation; and (2) New Jersey requires by statute that the shot be given. He also argued that any post-shot failure to warn was irrelevant in this case because Mrs. Niemiera actually called the doctor when she noticed the warning signs. The defendant further argued that any deviation from accepted medical standards was related only to negligent treatment by the doctor and not to any failure to warn. The trial court dismissed the failure-to-warn claims. We shall discuss its reasons in Part III of this opinion.

The jury returned a verdict of no cause for action against Gregory and his parents. It found no negligence on the part of the treating physician. On appeal, the Appellate Division affirmed the judgment in an unreported opinion. It ruled that the action against Wyeth for failure to warn was properly dis-

missed because "the manufacturer or marketer of DPT vaccine has a duty only to warn prescribing physicians of the potential adverse effects." It also ruled that the trial court did not err in denying the motion to amend the complaint against Wyeth. Finally, it rejected plaintiff's failure to warn theory finding that (1) plaintiff conceded any pre-shot failure-to-warn theory by admitting "[i]t was not Plaintiff's contention that Joy Niemiera would have postponed or not subjected her child to the vaccine injection if she had been fully informed as to the risks," and (2) "the absence of additional post-vaccination warnings could not reasonably be found to have proximately caused Gregory's injuries."

We granted plaintiffs' petition for certification. 110 *N.J.* 200 (1988).

### III

We recently have had occasion to consider the relationship between our principles of products liability law and pharmaceutical products. *Feldman v. Lederle Laboratories, Inc.,* 97 *N.J.* 429 (1984). In *Feldman,* we refused to "hold as a matter of law and policy that all prescription drugs that are unsafe are unavoidably so." *Id.* at 447. We explained:

> Drugs, like any other product[ ], may contain defects that could have been avoided by better manufacturing or design. Whether a drug is unavoidably unsafe should be decided on a case-by-case basis; we perceive no justification for giving all prescription drug manufacturers a blanket immunity from strict liability manufacturing and design defect claims under [*Restatement (Second) Torts* § 402A] comment k [ (1965) ].
>
> Moreover, even if a prescription drug were unavoidably unsafe, the comment k immunity would not eliminate strict liability for failure to provide a proper warning. As Justice Pollock stated in *O'Brien [v. Muskin Corp.,* 94 *N.J.* 169 (1983) ], "[w]ith those products, the determination of liability may be achieved more appropriately through an evaluation of the adequacy of the warnings." 94 *N.J.* at 183. Thus, a manufacturer who knows or should know of the danger or side effects of a product is not relieved of its duty to warn. Rather, as the comment expressly states, it is only the unavoidably unsafe product *"accompanied by proper * * * warning"* that is not defective. [*Ibid.* (citation omitted).]

The question in this case is not the adequacy of Wyeth's warning. Rather, the question is whether the warning should

have been communicated directly to the patient. It is conceded that Wyeth informed physicians through material that accompanied its product of the possible side-effects, including irreversible brain damage or death, attendant to the administration of this vaccine.

In New Jersey, as elsewhere, we accept the proposition that a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities. *See, e.g., Bacardi v. Holzman,* 182 *N.J.Super.* 422 (App.Div.1981). This concept is known as the "learned intermediary" rule because the physician acts as the intermediary between the manufacturer and the consumer. The phrase appears to have been coined in the case of *Sterling Drug, Inc. v. Cornish,* 370 *F.*2d 82, 85 (8th Cir.1966).

Plaintiff recognizes the general applicability of the doctrine but urges that we should carve out an exception such as was done in *Davis v. Wyeth Laboratories, Inc.,* 399 *F.*2d 121 (9th Cir.1968). In that case the manufacturer of a polio vaccine was held to have an independent duty to warn the consumer because in such mass immunization clinics as attended the giving of polio vaccine there is no physician present to weigh the risks and benefits of the drug therapy for each patient. *Id.* at 131. *See Reyes v. Wyeth Laboratories, Inc.,* 498 *F.*2d 1264 (5th Cir.), *cert. denied,* 419 *U.S.* 1096, 95 *S.Ct.* 687, 42 *L.Ed.*2d 688 (1974); *see also Stephens v. G.D. Searle & Co.,* 602 *F.Supp.* 379 (E.D.Mich.1985) (manufacturer of oral contraceptive has duty to warn consumers directly of risks and side effects); *Samuels v. American Cyanamid Co.,* 130 *Misc.*2d 175, 495 *N.Y.S.*2d 1006 (Sup.Ct.1985) (pharmaceutical company had duty to warn recipient of "travel" vaccines when company knew vaccines were ordinarily given without meaningful balancing of risks and benefits by informed intermediary).

We are satisfied that sufficient reasons exist with re-

spect to the DPT vaccine [2] to conclude that the "learned intermediary" doctrine should apply. Despite the presence of toxins, the pertussis vaccine has been very successful:

> In the United States, DPT is administered to infants and young children via a series of inoculations and booster shots. This program has dramatically reduced the incidence of pertussis. In 1934, there were over 250,000 reported cases of pertussis in the United States, and 7500 deaths caused by the disease. By the 1980s, there were, at most, 3000 cases and 20 annual deaths. [*Jones by Jones v. Lederle Laboratories*, 695 *F.Supp.* 700, 702 (E.D.N.Y.1988).]

Hence, although studies and cited reports have noted both temporary and permanent adverse reactions, the vaccine's utility is premised on the overall decline in infant mortality.[3] Plain-

---

[2]For purposes of our discussion, we shall accept as generally correct the description of this product as set forth in the recent opinion of District Judge McLaughlin in *Jones by Jones v. Lederle Laboratories*, 695 *F.Supp.* 700 (E.D.N.Y. 1988). He notes that "[w]ell into the twentieth century, the disease of pertussis, commonly known as 'whooping cough,' was responsible for thousands of deaths annually in the United States, mostly to infants." *Id.* at 701–702.

> The first vaccine type was known as "whole-cell." In a whole-cell vaccine, entire dead pertussis cells are injected into the vaccine to induce immunity. Part, but not all, of the cell stimulates immune response. This part is known as the antigen. Other parts of the cell may contain neurotoxins, which do not induce immunity and may cause brain damage. * * * [T]he vaccine, as administered, stimulates immunity to pertussis, but at the fearsome risk of causing neurological damage. [*Id.* at 702.]

There are other types of vaccine, one being the so-called "split-cell" design which contains pertussis cells that have been "fragmented by a chemical process. Debris from some of the cell was discarded, although both antigens and toxins remained in the vaccine." *Ibid.* This product was marketed from 1960–76 by Eli Lilly under the trade name Tri-Solgen. *Ibid.* In 1982, another company attempted to relicense the product, but the FDA refused. *Ibid.* Another type of vaccine, known as "acellular," has been available in Japan since 1981 but never has been marketed in the United States. In that process "a protein component from the whole cell is purified in part and placed in the vaccine. The rest of the cell is discarded. Acellular vaccines also contain toxins." *Ibid.*

[3]The federal Food and Drug Administration (FDA) regulates vaccine manufacturers pursuant to the Public Health Service Act, as amended, 42 *U.S.C.* § 262, and the federal Food, Drug and Cosmetic Act, as amended, 21 *U.S.C.* §§ 301 to 392. The regulations are quite detailed in their setting of standards for "safety," "effectiveness," and adequate labeling. Safety and effectiveness are determined in part based on a risk-to-benefit analysis. Furthermore,

tiff's expert testified, however, that one in 100,000 children will suffer a severe adverse reaction. Defendant's expert conceded that DPT is the "most crude of the vaccines we currently use."

Unlike Salk Polio vaccine or swine flu vaccine, the antipertussis vaccine is administered in a doctor's office on a case-by-case basis. Although not required to administer the vaccine personally, the physician almost invariably sees the patient before the vaccination is given. Such was the case here. Thus we are satisfied that sufficient reasons exist to maintain the "learned intermediary" doctrine with respect to this extraordinarily valuable childhood vaccine.

Moreover, we take note of the fact that recent legislative initiatives at both state and national level have tended to agree with the conclusion that ordinarily a warning to the physician is the "only effective means by which a warning could help the patient." *Davis v. Wyeth Laboratories, Inc., supra,* 399 *F.*2d at 130. The National Childhood Vaccine Injury Act of 1986, 42 *U.S.C.* §§ 300aa–1 to –34, which became effective October 1, 1988, provides in part:

> No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after the effective date of this subpart solely due to the manufacturer's failure to provide direct warnings to the injured party (or the injured party's legal representative) of the potential dangers resulting from the administration of the vaccine manufactured by the manufacturer. [42 *U.S.C.* § 300aa–22(c).]

Section four of the New Jersey Products Liability Act of 1987, *N.J.S.A.* 2A:58C–1 to –7, suggests the same. The legislative statement that accompanied the bill states:

> Section 4 provides that a manufacturer or seller is not liable in a warning-defect case if an adequate warning is given when the product has left the control of the manufacturer or seller or, in the case of dangers discovered after the product has left control, if an adequate warning is then given by the manufacturer or seller. *The subsection contains a general definition of an adequate warning and a special definition for warnings that accompany prescription*

---

additional specific requirements must be met by any manufacturer of a pertussis vaccine. *See* 2 *U.S.C.* §§ 620.1–.6; *see generally, Jones by Jones v. Lederle Laboratories, supra,* 695 *F.Supp.* 700 (describing FDA requirements).

*drugs, since, in the case of prescription drugs, the warning is owed to the physician.* The subsection establishes a presumption that a warning or instruction is adequate on drug or food products if the warning has been approved or prescribed by the Food and Drug Administration. [S. Judiciary Comm. Statement No. S. 2805, *L.* 1987, *c.* 197 (emphasis added).]

In addition, the Food and Drug Administration requires that special package inserts accompany only a certain limited group of prescription drugs whenever they are dispensed to a patient. *See Pharmaceutical Mfrs. Ass'n v. Food & Drug Admin.,* 484 *F.Supp.* 1179 (D.Del.) (upholding FDA regulations requiring patient package inserts describing possible side effects to be provided whenever estrogen-containing prescription drugs are dispensed), *affirmed,* 634 *F.*2d 106 (3d Cir.1980). Within the legislative framework, we agree that the DPT manufacturer does not have an independent duty to warn the patient.

## IV

■ Because "it is only the unavoidably unsafe product 'accompanied by proper * * * warning' that is not defective," *Feldman, supra,* 97 *N.J.* at 447 (emphasis omitted) (quoting *Restatement (Second) Torts* § 402A comment k (1965)), it would be the bitterest irony if the learned intermediary were to be excused from performing the very act that makes the product safe, that is, giving proper warning of the danger or side effects of the product. The concept of proper warning by the learned intermediary will blend in this context with the concept of informed consent. Both are aspects of the patient autonomy that underlies our law of medical care. *In re Conroy,* 98 *N.J.* 321 (1985) (recognizing the right to decline having medical treatment initiated or continued). We recently had occasion to refine our understanding of the informed consent doctrine in *Largey v. Rothman,* 110 *N.J.* 204 (1988). We there clarified that under appropriate principles of New Jersey tort law, a physician must disclose to a patient all material information that a "prudent patient" might find significant for a determination whether to undergo the proposed therapy. *Id.* at 211–12. Such a standard is appropriately relevant in the case

of failure to warn with respect to the adverse consequences of pharmaceutical products. As counsel for Wyeth put it, "[t]he duty of the manufacturer of the vaccine is to warn the learned intermediary who passes it on to the patient through informed consent." We have emphasized that "[w]hen the strict liability defect consists of an improper * * * warning, reasonableness of the defendant's conduct is a factor in determining liability." *Feldman, supra,* 97 *N.J.* at 451 (citations omitted).

Some commentators have urged a stricter subjective standard of informed consent with respect to prescription drugs, that is, one related to the particular patient. *See* Tietz, *Informed Consent in the Prescription Drug Context: The Special Case,* 61 *Wash.L.Rev.* 367 (1986). More might be required in the case of a patient who the physician knows or should know has a particular sensitivity, but certainly the threshold of information that makes the product safe to market needs to be disclosed.

We are satisfied, however, that the "prudent patient" standard can be applied in this case. Paradoxically, in this case the subjective standard seems to have been used by way of defense in an attempt to convince the jury that even if most ordinary persons would not know of the risks associated with DPT vaccines, Mrs. Niemiera was aware of such risks. The defense's opening statement to the jury told them:

> Do you know that in the emergency room where Nurse Niemiera worked they had a PDR [Physician's Desk Reference] that told you everything you needed to know, not only about the DPT, but you know, ladies and gentlemen, practically every other medication that's on the market in these United States. It was available to her.

Similarly, the first question the defense asked of each parent was "when did your wife graduate from nursing school?" and "when did you begin your nursing school training?". Joy Niemiera stated that, despite her training, she was not aware of the catastrophic consequences that can befall a DPT vaccine patient.

Nevertheless, under the objective prudent-patient theory the question is not what information a nurse would have needed to

assay the treatment, but what information a good mother would need to attend to the health of her child. In this regard the parent of the minor child is the one who must make the informed medical decisions.

Although the doctor did not recall either reading the pharmaceutical manufacturer's warnings that accompanied the product or the Physicians Desk Reference (PDR) entry on the vaccine, he testified on deposition that he was "generally aware" of their content. Both the manufacturer and PDR warnings detailed seven possible severe adverse side effects, including convulsions, collapse, inconsolable crying, and temperatures in excess of 105°. In addition to those potentially fatal side effects other more mild potential side effects were described.

In contrast, the warnings to Mrs. Niemiera, as recited on the information sheet given to her after the shot was administered, included only the less severe side effects: local redness or swelling, restlessness, and temperature between 100 and 102° F. Furthermore, the information sheet told Mrs. Niemiera only to treat those symptoms with aspirin, or similar substitute, and report any symptoms at the next visit.

As noted, in this case, on defendant's motion, the question of the physician's responsibility to warn was taken from the jury. Defendant broke his motion down into two aspects: "pre-shot" and "post-shot." Any claims of "pre-shot" deviation failed, he said, because Mrs. Niemiera never testified that she would have "opted not to take the shot," and because there are

State requirements which dictate the giving of a DPT shot. This doctor had no choice. So, even if he told Mrs. Niemiera, Mrs. Niemiera, this inoculation can cause brain damage, it can cause death, it can cause paralysis, but I have to give it anyway, she had no choice. So we don't have any cause and effect relationship between the alleged deviation and the giving of the shot.

Concerning the claims of "post-shot" deviation, defendant asserted that "there certainly wasn't any deviation in terms of advice to this lady, because she, in fact, called." Any deviation of the doctor would be in his response to the call.

The trial court based its decision to dismiss on several theories.[4]  In ruling on the motion, the trial court viewed the failure to furnish the "pre-shot" information as a "fifth red light," stating that in its view the plaintiff's first "red light" argument dealt with "lack of proper instructions given after the shot was given."  Thus, the court ruled that as to the pre-shot warning,

> [w]hat becomes more dispositive of that claim * * * is the fact that we have a mandatory law here in New Jersey that children, before they go to school, must subject themselves, and of course the parents must subject their children to these DPT shots before they can go to school.  The testimony indicates that the proper timing of this is when the child is but two months old.  * * * So, under those circumstances, the Court finds that the mother had no meaningful choice.  And absent a meaningful choice, there can be no malpractice with regard to informed consent * * *.

It further ruled that any claim by plaintiff that she would have delayed the shot because of her child's infection would be subsumed in the jury's evaluation of the physician's negligence in giving the shot "when the conditions indicated it ought not to be given."  With respect to the "post-shot" warnings, it ruled that "the fact that she did, indeed, call [the physician with respect to the child's reaction] robs that cause of action of any meaningfulness here."  In sum, it ruled that there was no jury issue of informed consent because (1) the patient had *no* choice because DPT vaccination is compulsory in New Jersey, and (2) any failure to warn would otherwise be subsumed in the jury's evaluation of any neglect in treatment.

We are unable to agree that as a matter of law either theory disposes of the claim in its entirety.  Under the "learned intermediary" doctrine, it is the physician's responsibility to pass on to the parties the information that enables the patient

---

[4]Preliminarily, we note that the court did not find that plaintiff had to testify that she would have "refused" the shot.  It did, however, find that (1) there was no expert testimony to establish the professional standard for such warnings, and (2) the post-shot warnings were factually reasonable.  This trial occurred before our decision in *Largey v. Rothman, supra,* 110 *N.J.* 204, established that the standard of informed consent related to the patient's needs, not the physician's judgment.  Before us defendant has not advanced these theories to sustain the ruling.

to use the product safely. In this case, the question was not whether the patient would have foregone the treatment but rather whether the failure to warn the patient deprived her of the opportunity to avert the medical catastrophe that can occur in some cases. A patient warned of the drug's potential consequences and the increased susceptibility of patients in certain contraindicated circumstances might have delayed the shot [5] or responded to the symptoms more aggressively.

On the first point, we also note, as the court recognized, that the compulsory-vaccination requirement in New Jersey is only a preschool requirement and does not require inoculation in the early months of childhood. *N.J.A.C.* 8:57–4.10. We say this without in any way suggesting that it is improper medical practice to inoculate infant children. The overall data are abundantly in favor of early childhood vaccination. However, the fact that a procedure is mandated by state law does not mean that a mother should not know that her child may suffer permanent brain damage or death from the vaccination.

The second point, that "lack of proper instructions given after the shot" was taken would be subsumed in the question of negligent treatment, overlooks the fact that although the physician may indeed have responded well to the developing medical crisis, it may then have been too late to save the patient. The fault may have lain in the earlier failure to alert the mother to the possibility of catastrophic side effects. Recall that it is the adequacy of the warning that makes the product safe and that plaintiff had claimed in his opening that there were four "red lights" that the physician had crossed in administering patient care: (1) the failure to warn; (2) failure to heed warning signals of bad health that contraindicated the vaccination; (3) failure to

---

[5]Although on appeal plaintiff did not, as the Appellate Division noted, "conten[d] that Joy Niemiera would have postponed or not subjected her child to the vaccine injections if she had been fully informed as to the risks," plaintiff did assert that Joy Niemiera "may have postponed Gregory's immunization given the fact she claimed he was having an eye discharge."

respond to the early onset of the reaction; and (4) the failure to treat it properly when alerted to the condition. It is the first issue that the plaintiff was prohibited from presenting to the jury.

We intend no judgment of the physician's conduct here. That is not for us to make. It is the factfinder's province. There were and will remain difficult issues of proximate cause in this case. But a "court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence viewed most favorably to the party opposing the motion." *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6 (1969), *quoted in Malin v. Union Carbide Corp.*, 219 *N.J.Super.* 428, 436 (App. Div.1987). Plaintiff need generally show only that the warning was inadequate and that "an adequate warning or instruction would have prevented the harm." *Campos v. Firestone Tire & Rubber Co.*, 98 *N.J.* 198, 209 (1984) (quoting Keeton, *Products Liability—Inadequacy of Information*, 48 *Texas L.Rev.* 398, 414 (1970)), *quoted in Malin, supra,* 219 *N.J.Super.* at 439.

"[W]hen there is evidence [in medical malpractice cases] that a defendant's negligent act or omission increased the risk of harm to one in the plaintiff's position and that harm was in fact sustained," the finder of fact is entitled to determine [on the basis of competent proof] " 'whether or not that increased risk was a substantial factor in producing the harm.' " [*Keir v. United States,* 853 *F.*2d 398, 415–16 (6th Cir.1988) (quoting *Evers v. Dollinger,* 95 *N.J.* 399, 414–415 (1984) (quoting *Hamil v. Bashline,* 481 *Pa.* 256, 269, 392 *A.*2d 1280, 1286 (1978))).]

In this case there was slim but competent evidence that an adequate warning could have prevented the harm. Plaintiff's expert witness testified that the child's condition was not irreversible:

[I]n this case, [the problems] of several days later with extremely high fever, seizures and the anoxia or the lack of oxygen to the tissues, particularly the brain, this could have been avoided had it been picked up earlier, in my opinion.

Reasonable minds might have concluded, on the basis of this evidence, that insulating a prudent patient from knowledge that convulsive brain disorders were a potential side effect of DPT vaccine could, to a reasonable degree of medical probability, have substantially increased the risk of harm that eventually

befell the patient. Specifically, by not alerting the mother to the gravity of the consequences of her child's symptoms, the physician deprived the child of the opportunity for early intervention that could have saved him from that fate. If she had been adequately warned, she might have been more aggressive in seeking appropriate treatment.

Our decision is by no means a contraindication to the accepted medical practice of early and routine inoculation of infants against childhood disease. The data are overwhelmingly in favor of the procedure. Physicians can no more guarantee a safe passage through childhood than can medical science itself. With the benefit of appropriate warnings from pharmaceutical manufacturers, they will be in a position readily to alert their patients to the rare but possible effects of the medication.

DPT has an extraordinary potential for decreasing child-mortality rates and the National Childhood Vaccination Injury Act of 1986, 42 *U.S.C.* § 300aa–1 to –34, by providing a no fault remedy for some of the losses suffered by the one child in 100,000, may go a long way to eliminate the fitful dependency on tort litigation to provide human succor for the unfortunate few. But parents need to know the risks of the treatment and be prepared to use all the self-help they can to avert those consequences.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division to retry plaintiff's failure-to-warn claim.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.