295 N.J. Super. 478 (1996)
685 A.2d 498
JACQUES E. CHELLY, PLAINTIFF-APPELLANT,
v.
KNOLL PHARMACEUTICALS, A UNIT OF BASF K & F CORPORATION (BASF GROUP), DEFENDANT-RESPONDENT, AND EDWARD B. KIRSTEN, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1996.
Decided December 2, 1996.
*480 Before Judges KEEFE, CONLEY and LOFTUS.
Edward F. Broderick, Jr. argued the cause for appellant (Broderick, Newmark & Grather, attorneys; Mr. Broderick, on the brief).
Melvyn H. Bergstein argued the cause for respondent (Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, attorneys; Smith, Stratton, Wise, Heher & Brennan, attorneys; Mr. Bergstein and Ellen O'Connell, of counsel; Mr. Bergstein, Ms. O'Connell and Wendy J. Lario, on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
From December 8, 1988 to March 6, 1989 when he was fired, plaintiff was an at-will employee of defendant Knoll Pharmaceuticals as its Director of Cardiovascular Research. Subsequently, plaintiff sued Knoll alleging a wrongful discharge under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980).[1]
*481 The parties stipulated to a determination by the trial judge on the threshold issue of whether the conduct for which plaintiff claimed he was discharged was in objection to a violation of a "clear mandate of public policy" on the part of Knoll. That is, was there a "clear mandate of public policy" that Knoll had violated and in response to which plaintiff had taken some action implicated in his discharge. See Warthen v. Toms River Community Mem. Hosp., 199 N.J. Super. 18, 25, 488 A.2d 229 (App.Div.), certif. denied, 101 N.J. 255, 501 A.2d 926 (1985). Following a bench trial on that issue, the trial judge concluded not. The trial judge also concluded that defendant's belief that Knoll's conduct was violative of a clear mandate of public policy was not reasonable. We are convinced that the trial judge correctly resolved the threshold issue and affirm on that basis. We, thus, need not and do not consider any issues concerning plaintiff's belief that the objectionable employer's conduct constituted a violation of a clear mandate of public policy.[2]
*482 Plaintiff's wrongful discharge claim here is premised upon an allegation that Knoll's conduct was violative of public policy in three respects. The first two arise out of information obtained from clinical investigators (doctors) concerning instances of elevated liver enzyme readings in patients participating in clinical trials on a new drug, Gallopamil.[3] It was plaintiff's belief that that information should have been immediately disclosed to the FDA and to the clinical investigators under the applicable federal regulations.
The third area of alleged violation concerns a letter from Edward Kirsten, Knoll's Director of Clinical Research and a subordinate of plaintiff, offering to pay a medical investigator for publication of a paper on an unapproved drug and also offering the assistance of a Knoll employee. As to this, plaintiff contended that the letter was unethical, but the trial judge found no federal regulations, code of ethics or any other source that a clear mandate of public policy that was violated by the letter. Rather, he concluded that plaintiff simply "was angry that somebody beneath him in the structure of the company dared to make this offer without clearing it with him...." We are convinced plaintiff's claim of error as to this in point III of his brief is without merit and requires no further discussion. R. 2:11-3(e)(1)(A), (E).
Further, as to the dispute concerning disclosure to the clinical investigators and the common law informed consent principles, see Largey v. Rothman, 110 N.J. 204, 540 A.2d 504 (1988), and Febus v. Barot, 260 N.J. Super. 322, 616 A.2d 933 (App.Div. 1992), raised *483 sua sponte by the trial judge,[4] counsel conceded during oral argument that the proper focus, in terms of the Pierce threshold issue, must be the federal regulations that govern disclosure of necessary information to the clinical investigators. We, therefore, focus our analysis upon those regulations in considering plaintiff's claim here that he did prove a "clear mandate of public policy" violated by Knoll in its, in plaintiff's view, tardy disclosure to the clinical investigators. To the extent, in any event, that the more general common law informed consent principles can be a basis for a Pierce cause of action under the circumstances here, we would affirm the trial judge's conclusion that defendant did not establish a violation of those principles as amply supported by the record before him.

a.
As we have said, the controversy here arises out of clinical trials on Gallopamil, a new drug manufactured by Knoll for the treatment of hypertension, and reports of elevated liver enzyme readings in connection with that drug. It is critical, in this respect, to note, as did the trial judge, that the issue involved not whether Knoll should report the adverse readings at all, but when it should do so. It is also important to recognize, in terms of the informed consent issue, i.e. disclosure to the clinical investigators, that the clinical brochure for the drug initially sent to the clinical investigators and required under FDA regulations, informed the investigators at the outset of the clinical trials that an initial testing of the drug in Germany had produced an elevated liver enzyme reading in one patient out of a trial of 4000 patients. The brochure further included as a protocol of the trials that during the treatment period liver enzyme tests must be regularly performed to monitor *484 the liver function of the patients. There is no evidence to suggest that as far as Knoll was aware at the time of the initial brochure the information in the brochure was not accurate and it is conceded by plaintiff that the brochure did alert the clinical investigators to a potential adverse affect upon a participating patient's liver. Both plaintiff and his experts also conceded that this information was adequate and that it would be the clinical investigator's judgment as to whether the patient should be so informed.
The clinical trials at issue here commenced in January 1988 with 750 hypertensive patients. As we have said, plaintiff commenced his employment with Knoll on December 12, 1988. As Director of Cardiovascular Research, his job responsibilities included preparation and presentation of data to the FDA to obtain approval of new or "investigational" drugs. His job description, in that respect, stipulated that he was to work "under company policies and within the constraints of federal regulations for the development of drugs."
The series of events triggering, plaintiff claims, his firing commenced on December 23, 1988 when he received a memo dated December 22 from one of his clinical research associates stating that a participating patient, who had been taking 150 milligrams of Gallopamil daily since November 18, was discontinued because of elevated liver enzymes. The memo included the pertinent laboratory results showing increases in two types of the enzyme transaminase (SGPT and SGOT) from fourteen and nine units per liter on November 14 to ninety-seven and 121 units per liter on December 21. The normal enzyme reading is between twelve and forty.
Plaintiff was aware of the prior experience in Germany. At a monthly tracking meeting on January 16, 1989, he "indicated very strongly and very firmly to everyone that I felt we had an obligation to both the patient and FDA investigator" to institute a system to track safety information on clinical trials. Establishing a better monitoring system was his concern at that time. However, on January 24, 1989, plaintiff received a memo based upon a *485 report from a clinical investigator that another patient, who had been taking 150 milligrams per day of Gallopamil for two weeks, was discontinued by his clinical investigator because of elevated liver enzymes of 880 and 318 from 30 to 28 over two weeks. At that point, plaintiff believed the second report was "a very serious adverse reaction"; he had never seen levels this high. He thought that this substantial "release of enzyme from the liver into the general circulation" constituted a "risk for major hepatic injury." However, he conceded that he had no information that the elevated readings actually harmed the patient. He also admitted that this was not "serious" as defined in the pertinent federal regulations. Nevertheless, in his opinion, this was an unexpected adverse event that he thought should have been reported to the FDA and so advised his superiors.
Contrariwise, the pertinent federal regulation then provided:
The sponsor shall notify FDA and all participating investigators in a written IND (investigational new drug) safety report of any adverse experience associated with use of the drug that is both serious and unexpected. Such notification shall be made as soon as possible and in no event later than 10 working days after the sponsor's initial receipt of the information.
[21 C.F.R. § 312.32(c) (emphasis added).]
21 C.F.R. § 312.32(a) provided that "[w]ith respect to human clinical experience, a serious adverse drug experience includes any experience that is fatal or life-threatening, is permanently disabling, requires inpatient hospitalization, or is a congenital anomaly, cancer, or overdose...." None of the reports of elevated readings here were accompanied by any indication of such "serious adverse drug experience."
Knoll did not, at that time, accede to plaintiff's views that the incidents should be immediately reported to the FDA. Plaintiff unsuccessfully pursued his views with officials of Knoll AL, the parent company of Knoll, on a trip to Germany in February 1989. When he returned on February 20 from his business trip, he saw additional monitoring reports on the Gallopamil clinical trials prepared in January and which showed other incidents of elevated liver enzyme readings. One patient was discontinued after seventeen *486 days of treatment because of elevated readings of 281 and 179 units per liter. Another patient was also discontinued because of readings of 267 and 127. Plaintiff considered neither of these experiences, alone, a reportable event but in the face of the other incidents they were "a part of known unexpected large number of patient[s]" with elevated readings. The reports also included a patient who had an elevated liver enzyme reading of 500 units per liter. The level of liver enzymes in this patient, however, returned to normal within two weeks with no indication of any adverse effects. Nonetheless, plaintiff believed that this was an immediate reportable event because of the "magnitude of the increase."
On February 21 plaintiff left for a business meeting in Toronto. On February 24 he met with Dr. Fritz Frickel, Vice President of Research and Development, and expressed his concern over the frequency of the elevated liver enzyme readings. After the meeting, he went on a previously scheduled one-week vacation and when he returned to Knoll on March 6, he was told he was fired.
As to the reports of experiences of elevated liver enzyme readings, it is undisputed that on April 6, 1989, the determination was made by Knoll to notify the FDA. At that time, there were then 13 known experiences out of the 750 participating patients. It is also undisputed that no symptoms of liver damage or other adverse effects attributable to the drug were known by Knoll. An April 20, 1989 memo reflects the substance of the FDA contact:
Dr. Kirsten briefed Dr. Chun [an FDA medical reviewer] on the adverse reaction reports.... Dr. Chun asked if any patients had developed hepatitis or hepatomegaly. Dr. Kirsten said none of the patients had developed any clinical symptoms. Dr. Chun said that the submission of an IND [investigational new drug] Safety Report was unnecessary. She requested that we address the findings in our upcoming annual report for IND 25, 411.

[Emphasis added.]
This was done.
As to the clinical investigators, 21 C.F.R. § 312.55(b) then provided:
The sponsor shall, as the overall investigation proceeds, keep each participating investigator informed of new observations discovered by or reported to the sponsor on the drug, particularly with respect to adverse effects and safe use. Such *487 information may be distributed to investigators by means of periodically revised investigator brochures, reprints or published studies, reports or letters to clinical investigators, or other appropriate means. Important safety information is required to be relayed to investigators in accordance with § 312.32 [requiring disclosure of "serious and unexpected" adverse consequences].
Although the respective experts sparred over the term "chemical hepatitis," and as that might have been reflected by the elevated readings, there is no evidence whatsoever of any extant harm or injury, most certainly not within the concept of serious adverse consequences in 21 C.F.R. § 312.32, caused by the elevated readings. 21 C.F.R. § 312.55(b), therefore, did not require the ten-day disclosure time-frame. The clinical investigators were, nonetheless, advised of the elevated readings in April 1989. See 21 C.F.R. § 312.50 (sponsors must ensure that "participating investigators are promptly informed of significant new adverse effects or risks with respect to the [new] drug."); 21 C.F.R. § 50.25(b)(5) (part of a participating clinical investigator's informed consent responsibility to his or her patient is to provide a statement to the patient of "significant new findings developed during the course of the research which may relate to the subject's willingness to continue participation ....").

b.
Ordinarily, in the context of private employment and in the absence of a contract, employers are free to discharge their employees with or without cause. E.g. Pierce v. Ortho Pharmaceutical Corp., supra, 84 N.J. at 65-66, 417 A.2d 505. The Supreme Court recognized in Pierce, however, an exception to that discretion on the part of private employers "when the discharge is contrary to a clear mandate of public policy." Id. at 72, 417 A.2d 505. The phrase "clear mandate of public policy" has been somewhat loosely characterized in some cases. See for example Fineman v. New Jersey DHS, supra, 272 N.J. Super. at 619, 640 A.2d 1161 ("In reviewing at-will employee terminations in a regulated setting, courts should give consideration `to whether the regulatory scheme contains effective alternate means for the employee to voice concern about a perceived policy violation....' *488 [A] `clear mandate of public policy ...' `is a matter of weighing competing interests.' This often involves considering `the competing interests of society, the employee and the employer.'" (citations omitted)); Mehlman v. Mobil Oil Corp., supra, 291 N.J. Super. at 127, 676 A.2d 1143 ("professional liability may be a relevant consideration in ascertaining a clear mandate of public policy."). For the most part, these somewhat broad expressions of what may constitute a mandate of public policy implicated in an employee's conduct leading to his or her discharge have arisen in cases arising under the CEPA. As we have previously observed, in some respects CEPA may establish a more expansive wrongful discharge cause of action.
But whatever may be the scope and concept of the threshold public policy factor under CEPA, we are convinced the exception created by the Supreme Court in Pierce is limited, in recognition of the still viable at-will employment relationship. It is not just a possible breach of some common law duty or policy concern that will satisfy the threshold. A discharged at-will employee who claims wrongful termination under Pierce must identify "a clear mandate," that is a clear "specific expression" of public policy that has been violated by the employer and in response to which the employee had taken the action that has prompted his discharge. 84 N.J. at 72, 417 A.2d 505. The sources of such "specific expressions" or "clear mandates" are statutes, regulations and judicial decisions, and may "in certain instances," include a professional code of ethics. Ibid. But the court expressly cautioned that not all such sources will implicate a wrongful discharge within the meaning of Pierce  only those that "express a clear mandate." Ibid. And, thus, the Court further took care to emphasize that a difference of professional opinion between an employee and those with the corporate decision making power is not a sufficient basis for a wrongful discharge cause of action. Id. at 75, 417 A.2d 505. And see House v. Carter-Wallace, Inc., 232 N.J. Super. 42, 49, 556 A.2d 353 (App.Div.), certif. denied, 117 N.J. 154, 564 A.2d 874 (1989). This is so even *489 though the dispute arises from the employee's well-intended and conscientious concern for potential harm to those who might be affected by the corporate conduct of which the employee objects.
Pierce itself makes that clear. Plaintiff there was a medical doctor employed by defendant drug company and responsible for the development of therapeutic drugs and establishment of procedures for testing them. In that capacity, she opposed defendant's determination to file an investigative new drug application with the FDA for a new drug, Loperamide, and to obtain approval to begin clinical testing of that drug on humans. Loperamide had been developed to treat diarrhea in infants, children and the elderly. One of its ingredients was saccharin. It was plaintiff's medical judgment that saccharin could be harmful to humans. When she opposed the IND and clinical trials she was fired. In claiming that her discharge was wrongful, plaintiff relied upon the Physician's Hippocratic Oath which requires a doctor to prescribe medication only for the good of the patient and to refrain therefrom where harm would result. The Court determined, however, that the Hippocratic Oath did not prohibit the particular research and, thus, did not establish a clear mandate or specific expression of public policy that would be violated by the corporate decision to proceed with the new drug testing procedures. Plaintiff's opposition, then, amounted to no more than "a difference in medical opinions," no matter how great was her safety concern. Pierce v. Ortho Pharmaceutical Corp., supra, 84 N.J. at 75, 417 A.2d 505.
In so concluding, the Court observed in language applicable here that "[r]esearch on new drugs may involve questions of safety, but courts should not preempt determination of debatable questions unless the research involves a violation of a clear mandate of public policy." Id. at 76, 417 A.2d 505. Absent an employee's ability to point to such a clear expression and its contravention, the extent and methods of the employer's research are to be governed by government regulations, liability in tort, and corporate responsibility. Ibid. And see Fineman v. New Jersey DHS, supra, 272 N.J. Super. at 606, 640 A.2d 1161 (discharged *490 doctor's refusal to treat patients in opposition to his professional and ethical beliefs that defendant's staffing decisions were violative of regulatory patient and caseload ratios did not support a Pierce cause of action); House v. Carter-Wallace, Inc., supra, 232 N.J. Super. at 42, 556 A.2d 353 (discharged employee's opposition to distribution of batches of toothpaste he thought were contaminated did not support a Pierce cause of action); Warthen v. Toms River Community Mem. Hosp., 199 N.J. Super. 18, 488 A.2d 229 (App.Div.), certif. denied, 101 N.J. 255, 501 A.2d 926 (1985) (discharged nurse employee's professional objection to a recognized medical procedure which was not violative of the Code of Nurses did not support a Pierce cause of action). Contrast Kalman v. Grand Union Co., 183 N.J. Super. 153, 443 A.2d 728 (App.Div. 1982) (discharged pharmacist who refused to close a pharmacy because to do so clearly would violate the Board of Pharmacy regulations had a Pierce wrongful discharge cause of action).

c.
In the light of these legal principles, the trial judge's conclusion that plaintiff did not establish clear mandates of public policy that were violated by the manner, more particularly the timing, of the disclosure to the FDA pursuant to 21 C.F.R. § 312.32 and to the clinical investigators pursuant to 21 C.F.R. § 312.55 is unassailable. In this respect, the trial judge found that "everyone agreed, Dr. Chelly, the experts ... whoever testified on the subject [that] elevated liver enzymes are not serious. They don't cause any permanent harm to anyone." Our independent review of the record convinces us that this finding has ample basis therein. The concern of plaintiff and his experts was the potential for harm. But the pertinent federal regulations simply do not require the immediate reporting espoused by plaintiff of that type of speculative harm, albeit the instances would be (and were) required to be reported in the drug company's annual report and annual brochures to the clinical investigators. Moreover, *491 the evidence is overwhelming that none of the 13 instances of elevated readings actually harmed the patients.
We recognize that plaintiff professed to have a different interpretation of the regulations. But we cannot disagree with the trial judge's observation that "[b]ecause the regulation says it has to be both serious and unexpected ... [plaintiff] could not possibly have misunderstood that." In the end, the judge correctly analyzed the dispute over disclosure of the elevated readings as:
really one of timing not of whether they would get the information. Whether they would get it immediately rather than later was one of judgment. And in that sphere, when we get to that medical sphere, it's not a clear mandate because it's one of judgment, it's one of debate.
We agree. Simply put, what plaintiff and his experts opined the elevated readings required in terms of the immediacy of disclosure clearly exceeded the requirements of the applicable federal regulations governing Knoll's disclosure responsibilities to the FDA and its disclosure responsibilities to the clinical investigators. Plaintiff's medical judgment, then, that Knoll should do more, is no different than the doctor's medical judgment in Pierce. In both cases, the respective professional disagreement with the corporate management is the product of a difference in medical judgment, however well-grounded. It is not sufficient to form a basis for a Pierce wrongful discharge cause of action.
Affirmed.
NOTES
[1] Plaintiff chose not to assert a claim under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. As to whether any different result might have occurred under CEPA, we recently noted:

We appreciate that the Supreme Court has recently described CEPA as a codification of Pierce. See Barratt v. Cushman & Wakefield of N.J., Inc., 144 N.J. 120, 126-27, 675 A.2d 1094 (1996). In Young v. Schering Corp., 141 N.J. 16, 26, 660 A.2d 1153 (1995), however, the Court indicated that CEPA is only "a partial codification of the prior common-law prohibition against the retaliatory discharge of at-will employees," which Pierce had "principally articulated." For example, whereas Pierce required that the discharge must be "contrary to a clear mandate of public policy," 84 N.J. at 72, 417 A.2d 505, CEPA mandates only that the employee reasonably believe that a violation of public policy has occurred, N.J.S.A. 34:19-3a and 34:19-3c. Furthermore, although "internal expressions of disagreement with corporate policy" are insufficient to establish a claim of wrongful discharge under Pierce, House v. Carter-Wallace, Inc., 232 N.J. Super. 42, 51, 556 A.2d 353 (App.Div.), certif. denied, 117 N.J. 154, 564 A.2d 874 (1989), an employee need not communicate his belief to anyone outside of his company under either N.J.S.A. 34:19-3a or 34:19-3c. [Mehlman v. Mobil Oil Corp., 291 N.J. Super. 98, 124 n. 12, 676 A.2d 1143 (App.Div. 1996).]
Whether any of these differences would have been triggered here, or even whether plaintiff could have established a prima facie cause of action under CEPA is not before us.
[2] For instance, is the standard for measuring the reasonableness of the belief objective or subjective? Fineman v. New Jersey Dep't of Human Servs., 272 N.J. Super. 606, 610 n. 2, 640 A.2d 1161 (App.Div.), certif. denied, 138 N.J. 267, 649 A.2d 1287 (1994). See also Abbamont v. Piscataway Tp. Bd. of Educ., 138 N.J. 405, 424-25, 650 A.2d 958 (1994). And, whereas Pierce requires an actual violation of a clear mandate of public policy, 84 N.J. at 72, 417 A.2d 505, does CEPA require only that the employee reasonably believe such a violation has occurred? N.J.S.A. 34:19-3a, -3c; Mehlman v. Mobil Oil Corp., supra, 291 N.J. Super. at 123, 676 A.2d 1143 ("The statute requires the employee to have reasonably believed that the employer's conduct had either violated a law, rule or regulation, or had been incompatible with a clear mandate of public policy. The sine qua non of a CEPA claim is not the actual occurrence of a violation of promulgated authority or public policy, but rather the existence of a reasonable belief to the effect that such authority or policy has been breached."). And see MacDougall v. Weichert, 144 N.J. 380, 401, 677 A.2d 162 (1996).
[3] It is undisputed that the doctors who participate in the clinical trials are not Knoll employees, neither are the participating patients, patients of Knoll. The physician/patient relationship is solely between the doctors (herein after referred to as clinical investigators) and their patients. Before beginning a trial on a new drug through the participating clinical investigators and their patients, Knoll must file an Investigational New Drug Application (IND) with the FDA. 21 C.F.R. § 312.20. Part of the IND is an "Investigator's Brochure" which provides to the clinical investigators all information known about the new drug including all known potential adverse effects. 21 C.F.R. § 312.23(a)(5). This information is used by the clinical investigators in the preparation of consent forms for their patients. Knoll does not prepare or approve the consent forms under the federal regulatory new drug procedures.
[4] Our informed consent common law focuses upon the physician/patient relationship, not the manufacturer/physician relationship. Thus, it is actually the "learned intermediary" common law principle, if any, that would be relevant. See Niemiera v. Schneider, 114 N.J. 550, 559, 555 A.2d 1112 (1989); Ferrigno v. Eli Lilly & Co., 175 N.J. Super. 551, 581, 420 A.2d 1305 (Law Div. 1980).