272 N.J. Super. 606 (1994)
640 A.2d 1161
MILTON FINEMAN, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
NEW JERSEY DEPARTMENT OF HUMAN SERVICES, NEW JERSEY MEMORIAL HOME FOR DISABLED SOLDIERS, SAILORS, MARINES AND THEIR WIVES AND WIDOWS, JOSEPH M. CAGNO AND ROBERT J. BREZO, DEFENDANTS-APPELLANTS, CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 1993.
Decided April 29, 1994.
*608 Before Judges SHEBELL, LONG and LANDAU.
Brian P. Ballard, Deputy Attorney General, argued the cause for appellants, cross-respondents New Jersey Department of Human Services, New Jersey Memorial Home of Disabled Soldiers, Sailors, Marines & their Wives and Widows (Deborah T. Poritz, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel, and Mr. Ballard, on the brief).
John P. Morris argued the cause for respondent, cross-appellant.
The opinion of the court was delivered by LANDAU, J.A.D.
In this appeal by the defendants, New Jersey Department of Human Services (DHS) and the New Jersey Memorial Home for Disabled Soldiers, Sailors, Marines and their Wives and Widows (Home), and the cross appeal by plaintiff, Dr. Milton Fineman (plaintiff), we focus upon N.J.S.A. 34:19-3c(1) and (3), portions of the Conscientious Employee Protection Act (CEPA), N.J.S.A. *609 34:19-1 to 19-8. No less than its common law precursors, CEPA requires judicial resolution of threshold legal issues respecting existence of a statutory, regulatory or other clear mandate of public policy before the trier of fact determines whether an employee has been retaliated against for acting upon an objectively reasonable belief of the existence of such clear mandate by objecting to or refusing to perform acts in violation of the mandate. This opinion reverses a Law Division judgment, entered under CEPA following jury trial, in favor of plaintiff, a "Physician Specialist", who was terminated from his at-will employment after refusing to provide temporary medical care to residents of the Home other than those to whom he had been initially assigned. We affirm the judgment of dismissal entered in favor of defendant Joseph Cagno.

Procedural Setting
Following termination of his at-will employment, plaintiff filed a CEPA complaint in the Law Division against DHS; the Home; Joseph Cagno, its Chief Executive Officer; and Robert J. Brezo, the Assistant Chief Executive Officer. He demanded a jury trial, asserting that his termination constituted unlawful retaliatory action under N.J.S.A. 34:19-3c(1) and 3c(3).[1] Prior to submission to the jury, the complaint was dismissed as to defendants Brezo and Cagno. Also dismissed were plaintiff's demand for punitive damages, and allegations respecting retaliation for his refusal to *610 perform certain medication review certifications. The cross appeal challenges some of the dismissals.
Essentially, the jury was asked to determine whether plaintiff was terminated for a refusal to see or treat certain patients in excess of his originally assigned work load or for objecting thereto; and whether such refusal or objection was based upon reasonable belief that the temporary assignment evidenced a general policy or practice of patient care which violated a law or regulation (N.J.S.A. 34:19-3c(1)) or was incompatible with a clear mandate of public policy (N.J.S.A. 34:19-3c(3)), inclusive of applicable Department of Health regulations, the Hippocratic Oath, and the American Medical Association Principles of Medical Ethics.
On motion at the conclusion of plaintiff's case and again after all evidence was presented, the trial judge considered the threshold legal determinations required by Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980), which predated and furnished the underlay for legislative adoption of CEPA, as well as our opinion in Warthen v. Toms River Comm. Mem. Hosp., 199 N.J. Super. 18, 488 A.2d 229 (App.Div.) certif. denied, 101 N.J. 255, 501 A.2d 926 (1985). The judge concluded, as a matter of law, that the physicians' Hippocratic Oath and American Medical Association Code of Ethics, read in conjunction with N.J.A.C. 8:39-23.1, et seq. (mandatory medical services standards for long-term nursing care facilities) could be found to constitute, for CEPA purposes, a regulation (N.J.S.A. 34:19-3c(1)) or "clear mandate of public policy" (N.J.S.A. 34:19-3c(3)) which plaintiff could reasonably[2] have *611 believed would be violated were he to provide temporary medical coverage in excess of the one hundred resident caseload to which he was specifically assigned. He then submitted these questions to the jury:
1. Did plaintiff Milton Fineman reasonably believe that the Memorial Home's activity, policy or practice respecting a physician's patient responsibilities was: (A) In violation of a law, rule or regulation promulgated pursuant to law? (B) Incompatible with a clear mandate of public policy governing the public health, safety or welfare?
If you have answered "yes" to either # 1A or # 1B, or both, go to Question # 2.
If you have answered "no" to both # 1A and # 1B, return to the courtroom.
2. Did the plaintiff Milton Fineman object to, either in writing or orally, to the Memorial Home's activity policy or practice, or did the Plaintiff Milton Fineman refuse to participate in the defendant's policy or practice respecting patient care?
3. Was a determinative factor in the defendant's decision to discharge the plaintiff the result of the action taken by the plaintiff, as described in Question # 2 above, and thus, in retaliation for the action taken by the plaintiff as found in Question # 2?
If the answer to Question # 3 is "yes," you have rendered a verdict in favor of the plaintiff and you shall return to the courtroom.
If the answer to Question # 3 is "no," you have rendered a verdict in favor of the defendant and you shall return to the courtroom.
The jury answered "yes" to each question. The trial judge then entered judgment ordering plaintiff's reinstatement, a $1,000 fine for violation of N.J.S.A. 34:19-5g payable by the Home; and damages in the amount of $273,546 together with pre-judgment interest in the amount of $36,389.

Facts
The Home is a long-term care facility (nursing home) for disabled or elderly soldiers, sailors, marines, and their wives and widows. It is not a hospital. It receives federal subsidies as a state veteran's facility which is supervised by DHS, but is also inspected by the Veteran's Administration and the New Jersey Department of Health.
*612 On May 1, 1987, plaintiff was hired as a physician specialist at the Home. The medical director, Dr. Zubeda Rajput, provided plaintiff with information outlining his duties and responsibilities, which included covering for other staff physicians when they were absent or on vacation. Plaintiff was assigned as primary care physician for Units One-A and One-B, containing one hundred residents. He was also to provide on-call duties during certain evenings and weekends. Plaintiff's duties and responsibilities were described in the following fashion at time of hire:
Subject: Duties and/or Responsibilities are as follows but are not limited to:

Assigned to Units 1A and 1B. Responsible for total medical care in that unit.
Workdays are 8:30 A.M. to 4:30 P.M.
Share on duty calls with other staff physician. Presently will be every 3rd week.
To make rounds daily on your assigned unit.
To visit all nursing stations on weekends and/or holidays, when on call.
Responsible to complete all patient's medical records in the assigned unit and provide coverage for the facility.
To accept the responsibilities and duties of other staff physicians when they are on vacation, etc.
Directly responsible to the Medical Director and Assistant Chief Executive Officer.
Patient's medical records include:
1. Admission History, Physical, Medical Orders and Care Plans.
2. Medical Care Plan review every six (6) months or as needed.
3. Monthly pharmacy review sheets.
4. Aims  every three (3) months.
5. Monthly progress notes.
6. Annual lab work on members.
7. All verbal orders to be signed the next work day or within 48 hours.
All patient visits must be documented each time.
To attend all Monday morning meetings, and all other required meetings, committees, etc.
To attend case conference on your assigned patients.

[(emphasis in original)].
When plaintiff was hired, Dr. Alan Kulick was assigned as primary care physician in Unit Two and Dr. Rajput was to be the primary care physician for Unit Three. The Home had a total of approximately three hundred residents, divided equally among the three units.
*613 Plaintiff testified that he read a prior memo from Cagno stating that there should always be two physicians attending the institution. He also said he received similar information from Dr. Rajput. The record makes clear that when "on-call", or when on the rotating weekend/holiday duty, a staff physician would ordinarily have temporary responsibility for all three hundred residents, subject to back-up provided by local hospitals and physicians.
Prior to his hire in May, plaintiff was given to understand that a salary adjustment request would be made to raise his starting salary by approximately $9,000 per year. That request had not been acted upon as of the end of July, 1987, when the events leading to plaintiff's termination came to a head.
After plaintiff was hired, Dr. Kulick took a vacation from May 26 to June 3. Dr. Rajput was granted sick leave from June 2 to June 21, so that for part of June 2 and all day June 3, plaintiff was the only full-time physician present. The Home also regularly utilized local physicians and hospitals as necessary.
Shortly after Dr. Rajput returned on June 21, she was granted a six-month leave of absence, leaving two full-time physicians at the Home, but no formal vacancy in the three-physician complement. Cagno promised to try to get another physician on a full-time or part-time basis, but left for reserve military service in early July without completing that effort.
Plaintiff points out, and we note, that in the course of seeking to achieve a higher level of compensation for staff physicians to facilitate the attraction of candidates such as plaintiff, defendants had previously called to the attention of superiors in DHS the serious condition presented by having only two full-time physicians. We find nothing in the record to suggest that any defendant attempted to prevent plaintiff from seeking additional medical coverage or indeed the additional compensation he repeatedly requested for his higher-than-expected work load. To the contrary, although plaintiff was evidently dissatisfied with the vigor and competence of their efforts, the uncontroverted record suggests *614 that defendants were actively engaged in trying to achieve the same goals as plaintiff.
In early July, plaintiff and Dr. Kulick met with Cagno and Assistant CEO Brezo to discuss securing an additional physician, and additional compensation because of their added workload. Their concerns were brought to the attention of the Department's chief medical officer, Dr. Epstein. In fact, both Kulick and plaintiff were encouraged to contact Dr. Epstein directly to discuss additional compensation, as well as possible alternatives to the two-doctor situation. Additionally, it was agreed that plaintiff's complaints of negligence would be investigated and an administrative review conducted. In the meantime, Cagno was meeting with some success in arranging for part-time physician coverage, although plaintiff may not have been aware of this. Plaintiff was instructed to provide coverage for the residents.
Dr. Kulick had asked for a vacation week. He was told that he could go only if plaintiff would give written assurance that he would cover for him. Plaintiff declined to do so because that would leave him as the only staff physician for the three hundred residents. Nonetheless, Dr. Kulick simply departed for a one-week vacation on July 30 without authorization, and plaintiff was involuntarily faced with being the only full-time physician at the Home for the week. On July 30, plaintiff wrote to Cagno detailing the increase in his medical responsibilities. He concluded by stating:
As a month has now gone by without adequate indication that some adjustment of conditions or rewards are to accrue I wish to advise you that starting Monday, August 3, 1987, I will resume my contract obligations ONLY as outlined above. (Referring to the duties initially outlined.)
At a meeting on July 31, plaintiff told Cagno, Brezo, and Executive Assistant Pikolicky that additional physician coverage should be provided. On August 4, he advised Director of Nurses Barbara Davis that he would not be available for coverage of Units Two and Three except for emergent or life threatening situations. Commencing on August 3, Marva Tiller, a nurse, reported that plaintiff refused to treat anyone outside of Unit One. On August *615 5, Director of Nurses Davis notified Brezo of plaintiff's refusal to see three residents in need of immediate medical attention. On August 6, she listed eleven other residents who plaintiff declined to see, even though they required medical attention. Patients in distress were referred to nearby hospitals or seen by "physicians who agreed to be on call".
Plaintiff had also written that he would be away "without beeper" for the weekend of August 7-9.
By August 4, Cagno was able to secure physicians to serve on-call for the evenings and weekends. Cagno then recommended that plaintiff be terminated for failure to treat patients at the Home. Other people were consulted, including Brezo, Pikolicky, Division Director Leon Cheesman, and individuals in the Department of Personnel, who concluded plaintiff should be fired. Cagno contacted Dr. Epstein, Medical Consultant for the Department, who agreed with the recommendation, and passed it on to the Department's Office of Employee Relations. On August 10, Cagno told plaintiff he was fired effective August 7. He received a letter of termination signed by Cagno dated August 7.
Plaintiff testified that caring for three hundred patients was a violation of his ethical responsibilities based on the Hippocratic Oath, the American Medical Association ("AMA") Principles of Medical Ethics[3], and regulations governing nursing homes. Plaintiff did not know and could not say what specific regulation or statute would be violated.
The trial judge recognized and relied upon N.J.A.C. 8:39-23.1 and 23.2 identified by plaintiff's counsel during the trial. These regulations provide:
8:39-23.1 Mandatory structural organization for medical services
(a) Each facility with more than 60 beds shall have a medical director who is currently licensed to practice medicine by the New Jersey State Board of Medical Examiners.

*616 1. The medical director shall coordinate medical care and direct the administrative aspects of medical care in the facility.
2. The medical director shall approve all medical care policies and procedures. These policies and procedures shall be followed.
3. The medical director shall participate in the facility's quality assurance program through meetings, interviews, and/or preparation or review of reports.
4. The medical director shall be an active participant on the facility's infection control committee, pharmacy and therapeutics committee, and a committee that is responsible for developing policies and procedures for patient care.
(b) A physician shall visit each patient at least every 30 days unless the medical record contains an explicit justification for not doing so.
8:39-23.2 Mandatory policies and procedures for medical services
(a) The medical director shall ensure that for each patient there is a designated primary and an alternate physician who can be contacted when necessary.
(b) Each physician order shall be properly entered into the patient's medical record.
(c) Each patient's medical director or attending physician shall review the patient's medical record on a scheduled basis to ensure that care plans and medical orders are properly followed.
(d) The medical director shall review all incident reports.
(e) The medical director, or physicians designated by the medical director, shall respond quickly and effectively to medical emergencies which are not handled by another attending physician.
We take notice that the rules adopted by the Department of Health for licensed nursing homes include these much more detailed provisions concerning mandatory nurse staffing, evidently reflecting the principal mission of long term care facilities as distinct from hospitals:
8:39-25. Mandatory policies and procedures for nurse staffing
(a) There shall be a full-time director of nursing or nursing administrator who is a registered professional nurse licensed in the State of New Jersey, who has at least two years of supervisory experience in providing care to long-term care patients, and who supervises all nursing personnel.
(b) When the director of nursing is not present, there shall be a registered professional nurse or a licensed practical nurse on duty who shall be designated in writing as an alternate to the director of nursing, temporarily responsible for supervising all nursing personnel.
8:39-25.2 Mandatory nurse staffing amounts and availability
(a) The facility shall provide nursing services and licensed nursing personnel at all times.
(b) Operative July 1, 1989, registered professional nurses, licensed practical nurses, and nurse aides shall spend the following amounts of time on professional *617 duties (the hours of the director of nursing are not included in this computation except for the direct care hours of the director of nursing in facilities with fewer than 150 beds):
1. Total number of patients multiplied by 2.5 hours/day; plus
2. Total number of patients receiving each service listed below, multiplied by the corresponding number of hours per day:

Tracheostomy 1.25 hours/day
Use of respirator 1.25 hours/day
Head trauma stimulation/advanced neuromuscular/orthopedic
 care 1.50 hours/day
Intravenous therapy 1.50 hours/day
Wound care 0.75 hour/day
Oxygen therapy 0.75 hour/day
Nasogastric tube feedings and/or gastrostomy 1.00 hour/day

3. Prior to July 1, 1989, nurse staffing shall be provided pursuant to N.J.A.C. 8:39-43.3(a).
(c) In facilities with 150 licensed beds or more, there shall be an assistant director of nursing who is a registered professional nurse.
(d) There shall be visual observation by a member of the patient care staff of each patient at least once per hour. These observations need not be documented.
(e) A registered professional nurse shall be on duty at all times in facilities with more than 150 licensed beds and in facilities with specialized units that have been approved as such by the New Jersey State Department of Health.
(f) At least 20 percent of the hours of care required by (b) above shall be provided by individuals who are either registered professional nurses or licensed practical nurses.
(g) Medications shall be administered by authorized personnel in accordance with State and Federal laws and regulations.
(h) The nurse aide component of the facility's total hourly nurse staffing requirement, as specified in (b) above, shall be met by nurse aides who have completed a nurse aide training course approved by the New Jersey State Department of Health and have passed the New Jersey Aide Certification Examination.

Motions and Applicable Law
CEPA implemented the Supreme Court's opinion in Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980) which recognized that an employee-at-will may have a cause of action for wrongful discharge when the discharge is contrary to a "clear mandate" of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; *618 judicial decisions; and, in some instances a professional code of ethics. Ibid.
Pierce, supra, discussed the need to balance the interests of the employee, the employer and the public. Id. 84 N.J. at 71, 417 A.2d 505. The Court considered the special problems of employees who are professionals owing a special duty to abide, not only by federal and state law, but also by the recognized codes of ethics of their professions which may oblige them to decline to perform acts required by their employers. Ibid. Appreciating that professional codes of ethics, and indeed legislative, administrative and judicial pronouncements do not always "express a clear mandate of public policy", the Court laid down the rule that "absent legislation, the judiciary must define the cause of action in case-by-case determinations." Id. at 72, 417 A.2d 505. "An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy. However, unless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause." Ibid.
In Pierce, supra, the employer, Ortho Pharmaceutical, was engaged in human testing of drugs within a regulatory framework which involved supervision and approval by the Federal Food and Drug Administration. Id. 84 N.J. at 62-63, 417 A.2d 505. The Supreme Court concluded that "[r]esearch on new drugs may involve questions of safety, but courts should not preempt determination of debatable questions unless the research involves a violation of a clear mandate of public policy." Id. at 76, 417 A.2d 505. Thus, absent the employee's ability to point to such a clear mandate of public policy and its contravention, the extent and methods of the employer's research are to be governed by government regulation, liability in tort, and corporate responsibility. Ibid.
Later cases have continued to place the burden upon the professional employee in an at-will setting to identify "a specific *619 expression" or a "clear mandate" of public policy which would bar his or her dismissal. See e.g., Warthen v. Toms River Comm. Hosp., 199 N.J. Super. 18, 24, 488 A.2d 229 (App.Div.), certif. denied, 101 N.J. 255, 501 A.2d 926 (1985). We have held that CEPA was not intended to provide relief from an employer's response to objection by sabotage, Haworth v. Deborah Heart and Lung Center, 271 N.J. Super. 502, 638 A.2d 1354 (App.Div. 1994); nor from an employer's response to a refusal to treat based upon the employee's personal professional objections to a recognized medical procedure. Warthen, supra. In reviewing at-will employee terminations in a regulated setting, courts should give consideration to whether the regulatory scheme contains effective alternate means for the employee to voice concern about a perceived policy violation. See Citizens State Bk. of N.J. v. Libertelli, 215 N.J. Super. 190, 196, 521 A.2d 867 (App.Div. 1987) (cited with approval in Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 91, 609 A.2d 11 (1992)).
As the Supreme Court said in Hennessey, supra, "[a] `clear mandate of public policy' must be one that on balance is beneficial to the public." Id., 129 N.J. at 100, 609 A.2d 11. "Determining public policy is a matter of weighing competing interests." Id. at 99, 609 A.2d 11. This often involves considering "the competing interests of society, the employee and the employer." Id. at 100, 609 A.2d 11 (quoting Burk v. K-Mart Corp., 770 P.2d 24, 28 (Okla. 1989)). To this we add, in the present case, the need to consider the interests of all Home residents. The balance must take account of the residents' need for adequate medical and nursing attention, and recognition that membership in a profession may often require an especially high order of commitment and self-sacrifice. This is particularly true in the health professions.
Although the legislature has amended CEPA to permit trial by jury, N.J.S.A. 34:19-5, it continues to remain the function of the trial court to identify the mandate of public policy in each case as a question of law, a function analogous to interpreting a statute or defining a duty in a negligence case. See Warthen, supra, 199 *620 N.J. Super. at 24-25, 488 A.2d 229. More recently, in D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 531-532, 628 A.2d 305 (1993), the Supreme Court again recognized the requirement that the trial court determine initially the existence of a clear mandate of public policy and, in doing so, engage in the balancing of competing interests recognized in Hennessey, supra. Frequently, a summary judgment motion would be useful in this respect. Here, motions brought by defendants at the conclusion of plaintiff's case, and at the conclusion of all the evidence, afforded to the trial judge opportunity to consider whether the plaintiff satisfied his burden to establish existence of a specific law, regulation, or other clear mandate of public policy.
Where, as here, action is brought under N.J.S.A. 34:19-3c(1) and (3), the judge must first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true. When the judge has, as a matter of law, identified such a statute, regulation, or other clear source of expression of public policy, the matter may then go to the jury for determination of any disputed questions of fact, and for a finding as to whether there has been a retaliatory action against the at-will employee for either objecting to or refusing to participate in activity reasonably and objectively believed (1) to violate a statute or regulation or, (2) to be incompatible with a "clear mandate of public policy".
Here, the judge found that the "clear mandated public policy is providing generally for the health and welfare of patients within public facilities generally." He concluded that there was enough evidence to go to the jury, although reserving formal decision on the motion until after the jury verdict. At that time, the judge again rejected the argument that plaintiff had failed to establish what law, regulation or clear mandate of public policy was being violated.
In ruling on the motions for dismissal, the trial judge construed N.J.A.C. 8:39-23.1 and -23.2 to preclude the Home's medical director from utilizing doctors "in consultation with the facility or *621 with doctors on the staff of other facilities, geographically situate." The judge reasoned that, "it is the doctors' designated as attending doctors or primary doctors on this staff." This reasoning constituted an interpretation of the State regulation which would have required not merely designation of a primary and alternate physician, but that each alternate physician must also have his or her own back-up staff physician when filling in as the alternate.
We note, however, that the initial description of plaintiff's duties referenced above recognized that, when on call or when on rotating weekend/holiday duty, a staff physician would regularly have temporary responsibility for all 300 residents, subject to back-up provided by local hospitals and physicians. Moreover, N.J.A.C. 8:39-23.2 specifically contemplates that outside physicians may be designated by the medical director to respond to medical emergencies which are not handled by another attending physician.
Unlike the regulations governing mandatory nurse staffing, the mandatory medical services subchapter does not set forth staffing levels which correspond to the total number of patients. It is required, for example, that a registered professional nurse shall be on duty at all times in long term nursing home facilities with more than 150 licensed beds, but no comparable provision is made for physicians. Further, plaintiff's duty description specifically required that he "accept the responsibility and duties of other staff physicians when they are on vacation, etc."
Nonetheless, the judge concluded that:
[E]very patient has to have a primary physician and every doctor must perform services which in accordance with the Hippocratic Oath will be within a regiment [sic] which is good ... it may be totally reasonable, both from an objective and subjective standard, for a doctor to conceive who is employed to provide services for 100 patients regularly and to provide on-call services and night call services when needed pursuant to a rotating schedule, that to provide full-time services for 300 patients would interfere with the primary responsibility of providing care for the patients [for] which he has [been] designated as the primary physician ... and... a public policy of providing primary care with a designated doctor was being violated by the nursing home temporary policy ... albeit on a temporary basis....
Based on this reasoning, the judge ruled that "the plaintiff's case must go to the jury, and the jury must determine whether the *622 doctor was fired in retaliation for expressing that opinion that the Home was not providing services in accordance with State law." Accordingly, based upon public policy assertedly established by N.J.A.C. 8:39-23, the Hippocratic Oath, and the American Medical Association Principles of Medical Ethics, he declined to dismiss the plaintiff's case.
In amplifying his reasons for denial of the Home's motion, the judge made it clear that he found that plaintiff was "entitled to all the inferences which can flow, that as a matter of public policy there is a definitive public policy to which he has pinpointed and he's shown through his evidence that he had a reasonable belief that his continued providing services to 300 patients as requested was violative of that policy and, therefore, he had a right to object and, therefore the jury should determine whether or not he was retaliatory [sic] fired because he voiced those objections." Thus, the reasons expressed by the judge dealt with the case only as retaliation for expressing objections to policy, although the jury was also questioned as to retaliation for refusal to violate law or policy. In this case, plaintiff's asserted refusal to violate law or public policy took the form of refusing to see or treat residents other than those in Unit One at a time when no other staff physician was on the scene. Defendants say it was this conduct which led to plaintiff's termination.

Discussion
The State urges that the judgment below must be overturned because the Home was in compliance with applicable regulatory requirements, and because the court improperly relied upon N.J.A.C. 8:39-23.1 and 23.2, together with plaintiff's "reasonable" interpretation of a physician's obligations under the Hippocratic Oath and the American Medical Association's Principles of Medical Ethics, in concluding that there was a clear mandate of public policy sufficient for the jury to address.
Plaintiff responds that the trial judge correctly held that the regulations, coupled with Plaintiff's reasonable conscientious belief *623 that his actions were warranted by the Hippocratic Oath and Principles of Medical Ethics, constituted the requisite clear mandate. Plaintiff also reminds us that defendants made no objection to the jury charge or jury interrogatories on the issues considered herein.
CEPA is an important expression of legislative policy designed, as its title suggests, to afford protection to conscientious employees. We view the legislation as harmonious with the common law mandate provided in Pierce, supra. In particular, the necessity for judicial evaluation on a case by case basis of the existence of a "clear mandate", after balancing conflicting interests, remains critical in CEPA cases. See D'Agostino, supra, 133 N.J. at 531-32, 628 A.2d 305; Hennessey, supra, 129 N.J. at 99, 609 A.2d 11. Our attention to this requirement makes consideration of the litigant's arguments somewhat more complex than the briefs suggest.
The discrete analysis required by law must, in this case, involve separate consideration of the clear mandate of public policy question in connection with: a) plaintiff's objections to his temporary assignment and to the alleged consequences of inadequate staffing policy at the Home, and b) plaintiff's refusal to participate in the policy, expressed by his openly declining to see any patients other than those to whom he was primarily assigned.
When a professional employee merely raises an objection, the consequences, and therefore the necessary weighing of competing interests, are apt to differ materially from those produced when the objection is expressed by overt acts such as refusal to give medical assistance. In the present case, Dr. Kulick's unauthorized one week vacation and Dr. Rajput's six month leave of absence undoubtedly resulted in a large increase in plaintiff's medical work load. Nonetheless, undisputed proofs showed that a number of patients for whom plaintiff was the alternate physician were refused treatment by him. We cannot determine whether all or none of these were emergent, life-threatening situations, although it appears that in at least several cases residents were in severe *624 medical distress. Given the advanced age of most residents, it can reasonably be assumed that plaintiff's refusal to see or treat residents whose needs were brought to his attention by the nursing staff, could itself raise competing questions of medical ethics and responsibility.
In making their decision to terminate, plaintiff's refusal to see or treat Unit Two and Three patients was appropriately considered by the defendants in light of his assignment "to accept the responsibilities and duties of other staff physicians when they are on vacation, etc." and his professional obligation as the designated alternate physician. Thus, on the issue of retaliation for plaintiff's refusal to perform professional duties, the judge's balance should have taken into account not merely a single dimension of the public policy mandate asserted by plaintiff, but the existence of other applicable policies bearing upon clarity of the mandate, and whether it is beneficial to the public. See D'Agostino, supra, 133 N.J. at 531, 628 A.2d 305; Hennessey, supra, 129 N.J. at 100, 609 A.2d 11.
In our view, a balancing of interests test could not here support an objectively reasonable determination that there was a clear ethical and legal mandate of public policy requiring a physician to refuse to treat patients in distress. It was plain error requiring our attention in the interest of justice,[4] for the judge to have submitted to the jury questions respecting the reasonableness of plaintiff's belief that the Home's policies were incompatible with a clear policy mandate in connection with his refusal (as distinct from his mere objection) and respecting "retaliation" for such refusal.
Members of professions, whether employees or self-employed, are often required to push the limits of endurance in order to fulfill professional responsibilities. School classes may be oversized; crime areas under-patrolled; social care centers overworked; *625 needs of disabled persons inadequately addressed; to name only a few instances where legitimate professional frustration may be engendered because of inadequate commitment of public resources or for other reasons. We think it would be a rare case indeed where the intention of the Legislature in enacting N.J.S.A. 34:19-3c could be read by a court to find that one aspect of public policy was so clear as to override a physician's professional obligation to render medical treatment to the best of one's ability in difficult circumstances. When applied to plaintiff's refusal to see patients in Units Two and Three, this consideration alone was sufficient to render unclear the presence of any mandate of public policy. As to the refusal prong, the issue should have been resolved by granting defendants' motion.
In this limited context, we partially resolve the issue reserved in Abbamont v. Piscataway Tp., 269 N.J. Super. 11, 23 n. 5, 634 A.2d 538 (App.Div. 1993) respecting scope of the "reasonable belief" language when there is no actual violation. A terminated physician who seeks relief under this statute from consequences of refusing to treat patients, must be right about existence of a statutory, regulatory or clear mandate violation.[5] An extreme example might be refusal of an order to transfuse a patient with blood discovered to have been secured from a known hepatitis- or AIDS-infected donor, while safe alternative sources were readily available.
We turn briefly to a problem created by literal use of the disjunctive statutory language in submitting questions to the jury in this case. N.J.S.A. 34:19-3c prohibits retaliation because an employee "objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes ... etc." No distinction is drawn between a mere objection (including *626 complaints) and the possible consequences of a refusal to participate (e.g., a refusal to carry out a professional responsibility).[6] In ruling on the motions, the trial judge's denial was hinged only upon the reasonableness of a belief of violation of a law or regulation, or incompatibility with clear mandate of public policy, sufficient to render unlawful retaliation for making objection to the activity, policy or practice. Nonetheless, the form of the questions presented to the jury technically followed the statutory language but did not permit the jury to distinguish between a mere objection and a refusal to render professional services to more than a given number of patients.
Given the evidence, it is quite possible, indeed we find it probable, that the jury found plaintiff was terminated because he refused his assignment to see patients outside of Unit One, and not because of his objections. We held above that termination of an at-will physician employee for refusing to treat would not constitute a violation of N.J.S.A. 34:19-3c(1) or (3) on these facts. However, the effect of jury question number three, supra, was to enable the jury to so find. Because jury question two asked whether plaintiff objected to or refused to participate in defendant's practice of patient care, either could evoke a yes answer to question number three. If the jury found that the termination was occasioned by plaintiff's refusal to treat Unit Two and Three patients, the judgment clearly requires reversal.
To the extent the jury might have found that it was plaintiff's objections which triggered termination, however, we must decide whether a remand on this issue is appropriate.[7] This requires us *627 to consider: (1) the "objects to" aspect of N.J.S.A. 34:19-3c and sufficiency of basis for a reasonable objective belief of a legal or clear policy mandate violation; and, (2) whether the evidence was sufficient to support a jury verdict that plaintiff was terminated in retaliation for making objection, as distinct from refusing to treat.
We recognize that where an employee harbors an objectively reasonable professional belief that legally and medically requisite levels of physician staffing have been violated, the legislature probably would have wished to protect an employee's right to make objection, without fear of reprisal, even if it were later found by a court that there was no actual violation. It is likely that recognition of such probable legislative intent motivated the trial judge's rulings here.
Upon review of the regulations and ethical obligations relied upon by plaintiff, in light of this record, we conclude that the regulations do not establish minimum physician staffing levels keyed to the number of residents in long term facilities. As to the impact of the codes of medical ethics upon nursing homes medical staffing, these require highly subjective evaluations, which must vary widely with the nature of each facility, the type of disorders being treated, degrees of exigency, and countless other medical factors. In this case, only plaintiff's opinion was submitted in support of his ethical evaluation. Thus, the existence of a clear mandate, even by application of the lesser balancing measure we would apply to the "objection" prong of the statute, is anything but clear to us.
Nonetheless, we note that a conscientious physician might reasonably and objectively conclude that the Home required more staff physician assistance, not only during vacation periods, but throughout the year. Indeed, defendants themselves sought to avoid continued reliance upon a two-physician staff which they believed might result in future "problems" with supervisory agencies *628 such as the Department of Health and Veterans' Administration. The record makes clear defendants' efforts in this regard, including the hiring of plaintiff in May as a third physician. When Dr. Rajput took an extended six-month leave, physician staffing problems were rekindled.
In our view, it was not error to hold that plaintiff could reasonably and objectively believe that legal and ethical duties to provide competent medical care to residents of the Home were being inadequately served, and so make this view known. Retaliation against a physician-employee solely for making such objections known would be redressable under CEPA.[8]
We turn, then, to our second inquiry on the "objects to" prong  sufficiency of evidence. Defendants' motions for judgment N.O.V. and for new trial were denied below.
Upon careful review of the record, we conclude that the jury could not reasonably have determined that defendants terminated plaintiff solely because he objected orally and in writing, either to his temporary workload or to the general problem created by inadequate physician staffing. The evidence, much of it plaintiff's, overwhelmingly suggests that defendants were in agreement with plaintiff's complaints, were endeavoring to improve conditions, and actively encouraged his efforts to bring about both greater medical staffing and greater "rewards" for the medical staff. We find little but speculation to support a jury finding that the termination was not, as defendants have consistently stated, attributable to plaintiff's refusal to render service to the Unit Two and Three residents during the crisis created by Dr. Kulick's unauthorized vacation.

*629 Conclusion

We have found that no statute, regulation or clear mandate of public policy supported an objectively reasonable belief that plaintiff's refusal to treat patients was warranted. Termination for that refusal did not offend N.J.S.A. 34:19-3c(1) or (3). Although application of a balancing of interests tests to the plaintiff's medical objections to defendants' practices might have supported a reasonable objective belief that a clear policy mandate was violated, there was insufficient evidence to support a jury verdict that plaintiff's termination was attributable to retaliation for such objections. It is therefore unnecessary to remand.
These conclusions render moot other issues posed on appeal and cross appeal. The judgment for plaintiff is reversed. Judgment dismissing the complaint on the merits is awarded to defendants.
NOTES
[1] N.J.S.A. 34:19-3 provides in pertinent part:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:
* * * * * * * *
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law,
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
[2] On the motions, at points in colloquy, and in the jury charge, the trial judge appeared to recognize the necessity that plaintiff's belief be objectively reasonable. At other points, the concept of objective or subjective beliefs was interposed. The questions put to the jury omitted any requirement that plaintiff's belief be objectively reasonable. In Abbamont v. Piscataway Tp., 269 N.J. Super. 11, 23, 634 A.2d 538 (App.Div. 1993), a case involving a claimed retaliation for making complaints about health and safety violations in a school industrial arts shop, we held that a plaintiff's belief must be objectively reasonable. We noted, however, that Abbamont's proofs included an official safety guide publication which contained specific air supply and exhaust requirements, violations of which were the subject of expert testimony, and that plaintiff "did nothing more than assert his and his students' rights to a safe shop." Id. at 25, 634 A.2d 538.
[3] The Hippocratic Oath and AMA Principles are annexed at Appendices A and B.
[4] See R. 2:10-2. We recognize that defendants did not raise this issue below.
[5] It remains the law of this state that at-will employees "may be fired for any reason, be it good cause, no cause, or even morally-wrong cause, but not when the discharge is contrary to a clear mandate of public policy." D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 527, 628 A.2d 305 (1993).
[6] The complaint did not allege violation of N.J.S.A. 34:19-3a which prohibits retaliatory action against an employee who "Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;".
[7] As we earlier noted, the jury questions were not phrased in terms of plaintiff's objectively reasonable belief. Were our analysis otherwise to sustain the basis for a jury finding for plaintiff respecting the refusal to treat or the making of objection, this formulation would have constituted plain error requiring reversal.
[8] The call here is close. We have held in a pre-CEPA case that mere voicing of opposition internally within an organization is not grounds for a Pierce claim. House v. Carter-Wallace, Inc., 232 N.J. Super. 42, 49, 556 A.2d 353 (App.Div.) certif. denied, 117 N.J. 154, 564 A.2d 874 (1989). However, we reserved the question whether such conduct might provide a basis for action under the objection language contained in N.J.S.A. 34:19-3c. Id. at 51 n. 2, 556 A.2d 353.