NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1895-15T2

JAREER ABU-ALI,

 Plaintiff-Appellant,

v.

PINNACLE FOODS GROUP, LLC,
and STEPHEN GUNTHER,

 Defendants-Respondents.
______________________________________________

 Argued September 12, 2017 – Decided September 26, 2017

 Before Judges Yannotti and Carroll.

 On appeal from Superior Court of New Jersey,
 Law Division, Morris County, Docket No. L-
 0143-13.

 Damian Christian Shammas argued the cause for
 appellant (Law Offices of Damian Christian
 Shammas, LLC, attorneys; Mr. Shammas and
 Kristen Jasket Piper, on the briefs).

 Nicholas Stevens argued the cause for
 respondents (Starr, Gern, Davison & Rubin, PC,
 attorneys; Mr. Stevens, of counsel and on the
 brief; Jonathan J. Lerner, on the brief).

PER CURIAM
 Plaintiff Jareer Abu-Ali appeals from an order entered by the

Law Division on December 3, 2015, granting summary judgment in

favor of defendants Pinnacle Foods Group, LLC (Pinnacle), and

Stephen Gunther (Gunther). We affirm.

 I.

 Pinnacle is the owner of several food brands, including Vlasic

pickles, Log Cabin syrup, Comstock and Wilderness pie-fillings,

and Bernstein's salad dressings. In May 2011, Pinnacle hired

plaintiff as its Director of Product Development. His duties

included developing new products, maintaining current products,

and managing scientists and technicians in his group. Gunther was

Pinnacle's Vice President of Research. He was plaintiff's direct

supervisor.

 Plaintiff claims he disclosed to his supervisors certain

actions or practices regarding the company's products that he

believed were a violation of a law, rule, duly-promulgated

regulation, or a clear mandate of public policy. He alleges he had

a reasonable belief that in certain respects, the company was

violating the Federal Food Drug and Cosmetic Act (FDCA),

specifically, 21 U.S.C.A. § 331, or the Nutritional Labeling and

Education Act (NLEA), specifically, 21 U.S.C.A. § 343.

 Plaintiff alleges that he was asked to determine if certain

whole baby pickles, which the company had stored in a salt tank

 2 A-1895-15T2
and were more than one year past their "shelf-life," could be used

in the company's products. Plaintiff acknowledged that he did not

know who had determined the shelf-life of the pickles. He sampled

the pickles and informed Gunther and Mark Schiller, the company's

Executive Vice President, that in his opinion, the pickles should

not be used in the company's products. According to plaintiff, the

company modified its internal standards, extended the "shelf life"

of the pickles, and used the pickles to make relish.

 Plaintiff also claims that to generate savings, Pinnacle

directed him to remove an additional ten percent of the cucumbers

that the company was placing in its pickle jars. Plaintiff learned

that the company was already including fewer pickles than the

company's internal specifications required. Plaintiff reported his

findings to Gunther and other company executives.

 Plaintiff alleges he believed that if Pinnacle was putting

fewer pickles in the jars, the jar's nutrition label would not

accurately state the number of servings in the jar and its salt

content. He testified that the practice did not violate any

specific regulation, but he thought it violated "the spirit" of

some regulation. Pinnacle decided not to remove the additional ten

percent of the product from the jars.

 In addition, plaintiff claims he raised concerns about

Farmer's Garden 1 (FG1), a pickle product that Pinnacle was

 3 A-1895-15T2
developing. At some point, a Pinnacle plant worker told plaintiff

the FG1 test product did not taste right. Plaintiff investigated

the report and determined that the use of "expired" carrots could

have caused the taste. Plaintiff recommended that Pinnacle destroy

the test samples. Gunther agreed and the FG1 test products did not

go to market.

 Plaintiff further alleges that he received an e-mail

indicating that the metal caps on the FG1 jars had a tendency to

rust. It appears that a third-party manufactured the caps for

Pinnacle. Plaintiff determined that the manufacturer's production

process scratched the outside of the caps, which caused the

rusting. Plaintiff reported his findings and Pinnacle removed

products that had gone to market with the defective caps.

 Furthermore, plaintiff alleges that Pinnacle made certain

fraudulent financial projections. He reviewed the company's

internal "productivity sheets," which estimated certain savings.

Plaintiff found that some of the productivity sheets reflected

savings on projects that the company was no longer pursuing. He

also thought that some of the estimates were not realistic or

achievable. The company's Procurement Department agreed with some

of plaintiff's analyses and revised those estimates. At his

deposition, plaintiff testified that he did not know whether the

estimates were provided to the public. There is no evidence that

 4 A-1895-15T2
the estimates were incorporated in Pinnacle's public financial

disclosures.

 Plaintiff further claims that Pinnacle's Director of Meat

Procurement, Myron Welton, asked him to approve the use of certain

meat in its food products. Plaintiff determined that the meat was

not suitable for such use, and Gunther agreed. In addition,

plaintiff claims Pinnacle acquired certain brands of pie-fillings

from other companies, and the brands were undergoing a "packaging

graphics change." According to plaintiff, Pinnacle was including

less fruit and real sugar in the products, and replacing both

ingredients with high-fructose corn syrup.

 Plaintiff claims that as a result of the changes, the

nutrition labels on the products were not accurate. He did not,

however, know if the incorrect labels originated at Pinnacle or

the companies who sold the brands to Pinnacle. Pinnacle's

Regulatory Department corrected the labeling errors that plaintiff

identified.

 Plaintiff also claims that the nutrition labels on some syrups

inaccurately stated the calories of the products. Plaintiff raised

the issue with the company's Productivity, Quality Assurance, and

Regulatory Departments. Gunther approved revised labels for the

products, but authorized the use of the existing labels until the

new labels could be printed.

 5 A-1895-15T2
 Plaintiff further alleges that a third-party had manufactured

salad dressing for Pinnacle and shipped an order of the product

to a store in California. Plaintiff received a report that the

ingredients of the salad dressing did not separate as they should

and remained cloudy. Plaintiff also claims the product's contents

did not match the sugar, salt, and calorie content referenced on

the nutrition label. Plaintiff informed Gunther the product did

not meet the company's specifications and should be removed from

the store's shelves; however, Pinnacle informed the store the

product did not pose a safety hazard. Pinnacle asserts that it

later corrected the problem with the dressing.

 Plaintiff also raised concerns about the nutrition label on

Pinnacle's new Farmer's Garden 2 (FG2) product. The product label

referred to FG2 as "All Natural." Plaintiff alleges that the label

listed certain additives that were not natural and therefore the

label was not accurate. He also informed Gunther and others that

the company was not cleaning certain production machinery properly

and, as a result, FG2 contained salt that would affect the accuracy

of the label. Gunther agreed with some of plaintiff's concerns.

 On June 5, 2012, after plaintiff engaged in what Pinnacle

believed was inappropriate conduct toward a Pinnacle employee, the

company reclassified plaintiff's position as an independent

contributor. Pinnacle asserts the change did not affect

 6 A-1895-15T2
plaintiff's compensation or benefits. Plaintiff refused the

reclassification. Pinnacle then told plaintiff he could resign or

he would be terminated. Plaintiff resigned. Pinnacle asserts

plaintiff voluntarily resigned his position, but plaintiff claims

he was fired.

 In January 2013, plaintiff filed a complaint against Pinnacle

and Gunther asserting claims under the Conscientious Employee

Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. In his complaint,

plaintiff alleges defendants violated CEPA by subjecting him to

an adverse employment action in retaliation for his alleged

whistle-blowing activities. Plaintiff further alleges that as a

direct and proximate result of defendants' actions, he suffered

monetary damages and personal injuries. He sought compensatory and

punitive damages, attorney's fees and costs, and other relief.

 Defendants filed an answer and denied liability. After the

completion of discovery, defendants filed a motion for summary

judgment. On October 23, 2015, the Law Division judge heard oral

argument and on December 3, 2015, placed an oral decision on the

record. The judge decided there were no genuine issues of material

fact and defendants were entitled to judgment as a matter of law.

 In her decision, the judge stated that except for labeling

issues associated with certain products, plaintiff failed to show

he had a reasonable belief that Pinnacle had violated a law, rule,

 7 A-1895-15T2
regulation, or clear mandate of public policy with regard to the

contents or labeling of its food products. The judge also

determined that plaintiff had not shown that he engaged in whistle-

blowing activity protected by CEPA; plaintiff had not been

subjected to an adverse employment action; and he failed to show

a causal connection between his alleged whistle-blowing activities

and any adverse employment action. The judge memorialized her

decision in an order dated December 3, 2015. This appeal followed.

 II.

 On appeal, plaintiff argues that the trial court erred by

granting summary judgment in favor of Pinnacle. He contends he

presented sufficient evidence to raise genuine issues of material

fact as to whether: (1) he had an objectively reasonable belief

that Pinnacle was engaging in illegal and/or fraudulent

activities, practices, or conduct; (2) he engaged in protected

whistle-blowing conduct; (3) there is a causal connection between

the alleged whistle-blowing and the retaliatory action taken

against him; and (4) the reasons Pinnacle gave for its retaliatory

actions are pretextual.

 "An appellate court reviews an order granting summary

judgment in accordance with the same standard as the motion

judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). Therefore, we

"must review the competent evidential materials submitted by the

 8 A-1895-15T2
parties to identify whether there are genuine issues of material

fact and, if not, whether the moving party is entitled to summary

judgment as a matter of law." Ibid.; Brill v. Guardian Life Ins.

Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c).

 Here, plaintiff is asserting claims under CEPA. In order to

prevail on such a claim, the plaintiff first must establish:

 (1) he or she reasonably believed that his or
 her employer's conduct was violating either a
 law, rule, or regulation promulgated pursuant
 to law, or a clear mandate of public policy;

 (2) he or she performed a "whistle-blowing"
 activity described in N.J.S.A. 34:19-3(c);

 (3) an adverse employment action was taken
 against him or her; and

 (4) a causal connection exists between the
 whistle-blowing activity and the adverse
 employment action.

 [Lippman v. Ethicon, Inc., 222 N.J. 362, 380
 (2015) (quoting Dzwonar v. McDevitt, 177 N.J.
 451, 462 (2003)).]

 If a plaintiff establishes these elements of a prima facie

case, the defendant "must come forward and advance legitimate

nondiscriminatory reasons for the adverse conduct against the

employee." Klein v. Univ. of Med. and Dentistry of N.J., 377 N.J.

Super. 28, 38 (App. Div. 2005) (citation omitted), certif. denied,

185 N.J. 35 (2005). "If such reasons are proffered, plaintiff must

then raise a genuine issue of material fact that the employer's

 9 A-1895-15T2
proffered explanation is pretextual." Id. at 39. (citation

omitted).

 As we noted previously, plaintiff's CEPA claims are based on

his contention that he had a reasonable belief Pinnacle was

violating the FDCA or the NLEA with regard to certain acts and

practices in its food-production business. The FDCA authorizes the

Food and Drug Administration (FDA) to protect the public health

by ensuring that "foods are safe, wholesome, sanitary, and properly

labeled." 21 U.S.C.A. § 393(b)(2)(A).

 Among other things, the FDCA bans "adulterated" food from

interstate commerce. Young v. Cmty. Nutrition Inst., 476 U.S. 974,

976, 106 S. Ct. 2362, 90 L. Ed. 2d 959, 963-64 (1986) (citing 21

U.S.C.A. § 331). Under the FDCA, food is "adulterated"

 (1) [i]f it bears or contains any poisonous
 or deleterious substance which may render it
 injurious to health;

 . . . .

 (3) [I]f it consists in whole or in part of
 any filthy, putrid, or decomposed substances,
 or if it is otherwise unfit for food;

 . . . .

 (b) Absence, substitution, or addition of
 constituents. (1) [i]f any valuable
 constituent has been in whole or in part
 omitted or abstracted therefrom; or (2) if any
 substance has been substituted wholly or in
 part therefor; or (3) if damage or inferiority
 has been concealed in any manner; or (4) if

 10 A-1895-15T2
 any substance has been added thereto or mixed
 or packed therewith so as to increase its bulk
 or weight, or reduce its quality or strength,
 or make it appear better or of greater value
 than it is.

 [21 U.S.C.A. § 342.]

 Furthermore, in 1990, Congress enacted the NLEA, "which

altered, expanded, and clarified the [FDCA's] labeling

requirements." Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d 84,

92 (D.N.J. 2011) (citing 21 U.S.C.A. §§ 301, 321, 337, 343, 371).

Among other things, 21 U.S.C.A. § 343 provides that food intended

for human consumption that is offered for sale, must have a label

that provides the number of servings, the number of calories, and

the amount of sodium and sugars in the product. 21 U.S.C.A. §

343(q)(B)(C)(D).

 III.

 Here, plaintiff argues that he presented sufficient evidence

to raise a genuine issue of material fact as to whether he had an

objectively reasonable belief that Pinnacle was engaging in

practices that violated the FDCA or the NLEA. As we have explained,

plaintiff's claims relate to (1) the attempted use of certain baby

whole pickles in the company's food products; (2) the reduction

in the number of cucumbers in pickle jars; (3) the use of "expired"

carrots in a test product; (4) the request to use allegedly

"suspect" meat in products; (5) the use of metal caps on jars of

 11 A-1895-15T2
food that had a tendency to rust; (6) the alleged use of misleading

labels on pie-filling products; (7) the creation of certain

allegedly fraudulent financial projections; (8) the sale of

allegedly defective salad dressing; (9) the change of ingredients

in certain products without needed changes to the labels; and (10)

the substitution of sweeteners in syrups without changing the

labels.

 As we stated previously, the motion judge found that plaintiff

had presented sufficient evidence to show that he had a reasonable

belief Pinnacle had violated the FDCA and NLEA by changing the

ingredients in certain products without modifying the nutrition

labels for these products. The judge concluded, however, that

plaintiff failed to present sufficient evidence to show he had a

reasonable belief that Pinnacle was violating any law, rule,

regulation, or clear mandate of public policy with regard to the

other products.

 In her decision, the judge pointed out that the FDCA generally

bars the introduction into interstate commerce of adulterated

foods. 21 U.S.C.A. § 331. The judge noted that according to the

FDCA, food is considered "adulterated" if it contains poisonous

or deleterious substances, contains certain unsafe food additives,

is injurious to health, or includes substances that make it unfit

for consumption as food. 21 U.S.C.A. § 342(a), (b), or (c). The

 12 A-1895-15T2
judge concluded that except for the labels on certain pie-fillings

and syrups, plaintiff had not presented sufficient evidence to

support his claim that he had a reasonable belief the company was

violating either the FDCA or NLEA.

 The judge noted that plaintiff had not identified any specific

rule, regulation or standard that Pinnacle had allegedly violated,

and plaintiff had not presented "any evidence that would enable a

rational juror to conclude that Pinnacle's departure from internal

product specifications violated any specific government

specification." The record supports the judge's assessment of the

evidence.

 Here, plaintiff claims Pinnacle asked him to determine if

certain baby whole pickles that were allegedly past their "shelf

life" could be used in the company's products. Plaintiff testified

that he believed the use of the "decomposed" pickles violated the

FDCA. The FDCA precludes the sale of "adulterated" foods, but

plaintiff did not cite any rule or regulation indicating that the

pickles at issue were unfit for consumption as food.

 Plaintiff further alleges that Pinnacle used so-called

"expired" carrots in its FG1 test product. Plaintiff failed to

show, however, that Pinnacle's alleged use of the "expired" carrots

violated any specific rule or standard pertaining to the use of

 13 A-1895-15T2
such ingredients. Moreover, there is no evidence that Pinnacle

ever sold such products to the public.

 Plaintiff also claims the FG1 test product had metal caps

that had a tendency to rust. Plaintiff may have expressed concerns

about the rusting of the metal caps on the FG1 product, but the

evidence was insufficient to show that the caps adulterated the

contents of the jars or rendered the contents unfit for

consumption. Furthermore, Pinnacle had removed any products with

the deficient caps that had been sent to market.

 In addition, plaintiff claims a Pinnacle employee asked him

to approve the use of the allegedly "suspect" meat in certain

Pinnacle products. Plaintiff did not, however, approve the use of

the meat, and Gunther agreed with his decision. Plaintiff did not

present any evidence that Pinnacle ever used any tainted meat in

any food product. The mere fact that someone asked plaintiff to

approve the use of the meat is not a violation of the FDCA, and

plaintiff could not have a reasonable belief that Pinnacle was

violating the FDCA.

 Plaintiff also claims he reasonably believed Pinnacle

violated the FDCA and the NLEA by providing allegedly deficient

salad dressing to a store. He claimed the product had an inaccurate

label. However, a third-party had manufactured the product for

Pinnacle, and Pinnacle determined the deficiencies in the dressing

 14 A-1895-15T2
did not present a safety issue for consumers. Plaintiff did not

provide sufficient evidence to support the claim that he had a

reasonable belief the product was unfit for consumption or that

the label was inaccurate.

 Plaintiff also alleges he reasonably believed the labels for

Pinnacle's FG2 product violated the NLEA because the company used

the term "All Natural" on the label. As the motion judge noted,

however, the FDA had not established any standard for use of the

term "All Natural." In addition, plaintiff claims that the FG2

labels were false and misleading because the labels allegedly did

not match the ingredients in the product, and the salt content was

much higher than the actual product. The record shows, however,

that Pinnacle addressed many of the issues plaintiff raised

regarding FG2, and plaintiff failed to present sufficient evidence

showing that he had a reasonable belief the company sold FG2

products with inaccurate labels to consumers.

 Plaintiff's claim regarding the alleged faulty financial

projections also fails for lack of proof. He has not identified

any specific statute, rule, regulation, or clear mandate of public

policy that Pinnacle allegedly violated by creating these internal

company financial projections. Plaintiff identified errors in some

estimates and some were corrected. There is, however, no evidence

 15 A-1895-15T2
that Pinnacle disseminated any faulty estimates to the public, or

used them in any of the company's public financial disclosures.

 We therefore conclude that the motion judge correctly

determined that, with the exception of the labeling issues

pertaining to the change of ingredients in certain products,

plaintiff failed to present sufficient evidence to show he had a

reasonable belief Pinnacle violated either the FDCA or the NLEA.

 Plaintiff nevertheless argues that the motion judge erred by

requiring that he identify specific standards applicable to the

specific products about which he expressed concerns. Plaintiff

notes that a party asserting a CEPA claim need not show that his

employer actually violated a law, regulation, or clear mandate of

public policy. See Dzwonar, supra, 177 N.J. at 462 (citations

omitted).

 However, a plaintiff must "first find and enunciate the

specific terms of a statute or regulation, or the clear expression

of public policy, which would be violated if the facts as alleged

are true." Id. at 463 (quoting Fineman v. New Jersey Dept. of

Human Servs., 272 N.J. Super. 606, 620 (App. Div.), certif. denied,

138 N.J. 267 (1994)). The court "must identify a statute,

regulation, rule, or public policy that closely relates to the

complained-of conduct." Ibid. There must be a "close relationship"

 16 A-1895-15T2
between the plaintiff's claims and the alleged violation. Id. at

467.

 Here, plaintiff merely referred to the requirements of the

FDCA and the NLEA, which generally bars the introduction of

adulterated food into interstate commerce and requires accurate

labels for food products. Reference to the general requirements

of the FDCA and NLEA are insufficient, however, because CEPA

requires a showing of a "close relationship" between plaintiff's

concerns and the purported violations. As the motion judge noted,

plaintiff failed to cite any specific rule, regulation, or standard

applicable to the food products about which he had expressed

concerns.

 Therefore, with the exception of the two labeling issues

noted by the motion judge, plaintiff failed to show that, even if

his claims were proven, he had a reasonable belief that Pinnacle

violated a specific law, rule, regulation, or clear mandate of

public policy. Plaintiff failed to present sufficient evidence to

show the required "close relationship" between his claims and the

alleged violations of the FDCA and NLEA.

 IV.

 We turn to plaintiff's contention that the motion judge erred

by finding that he did not present sufficient evidence to show

that he engaged in whistle-blowing activity that is protected by

 17 A-1895-15T2
CEPA. In her decision, the motion judge concluded that although

plaintiff had raised concerns about some of the company's practices

and products, he had not raised any specific concern that the

company was violating the FDCA or the NLEA.

 As the judge pointed out, the record shows that plaintiff's

concerns related to the possible deviations from the company's

internal standards and specifications. The judge noted that

plaintiff had raised legitimate business concerns "about practices

that may result in the loss of customers or consumers purchasing

the product." Indeed, it appears that this was precisely the role

plaintiff had been hired to fulfill in his capacity as Pinnacle's

Director of Product Development. Nevertheless, the concerns

plaintiff raised did not rise to the level of whistle-blowing

protected by CEPA.

 As the record shows, plaintiff's responsibilities as

Pinnacle's Director of Product Development were part of the

company's internal process for reviewing and assessing existing

products and developing new products. Among other things,

plaintiff had the responsibility to ensure that the company's

products conformed with its internal standards and specifications.

In furtherance of his responsibilities, plaintiff reviewed the

suitability of certain product ingredients, the contents of the

 18 A-1895-15T2
jars, the lids on the jars, proposed changes to product

ingredients, and related labeling issues.

 That record also shows that in some instances, other persons

or departments in the company agreed with plaintiff's views and

in some instances, other persons or departments did not agree.

There is no evidence that the disagreements represented an effort

on the part of Pinnacle to introduce adulterated food into

interstate commerce, or regularly employ inaccurate labels on its

products. We agree with the motion judge's conclusion that internal

disputes regarding the products or the labels of the sort at issue

in this case do not constitute whistle-blowing protected by CEPA.

 The judge's decision on this issue was consistent with the

applicable law. See Hitesman v. Bridgeway, Inc., 218 N.J. 8, 31

(2014) (noting that CEPA protects employees who report an

employer's illegal or unethical conduct, but not routine disputes

in the workplaces about internal policies or procedures); Maw v.

Advanced Clinical Commc'ns, 179 N.J. 439, 445-46 (2004) (findings

that employee's private dispute with her employer about a

noncompete agreement was insufficient to support a claim under

CEPA because employee had not shown a clear mandate of public

policy regarding such agreements); Dzwonar, supra, 177 N.J. at

467-69 (holding that a CEPA claim could not be premised on a

disagreement about the manner in which a union conducted its

 19 A-1895-15T2
meetings or explained its actions to members because such a

disagreement was not closely related to any statutory violation);

Klein, supra, 377 N.J. Super. at 45 (noting that CEPA was not

intended to "settle internal disputes in the workplace").

 We therefore conclude the motion judge correctly found that

plaintiff failed to present sufficient evidence to show that he

engaged in whistle-blowing activity that is protected under CEPA.

 V.

 Plaintiff also argues that the motion judge erred by

concluding that he did not present sufficient evidence to raise a

genuine issue of material fact as to whether he had suffered an

adverse employment action. He contends that reclassifying his

position as an independent contributor was a demotion and his

resignation in lieu of termination was the equivalent of a

termination. Again, we disagree.

 In her decision, the motion judge noted that not every

employment action "that makes an employee unhappy" is an adverse

employment action under CEPA. The judge determined that a

reasonable juror could not find that Pinnacle took any retaliatory

action against plaintiff that is actionable under CEPA.

 CEPA defines retaliatory action as "the discharge, suspension

or demotion of an employee, or other adverse employment action

taken against an employee in the terms and conditions of

 20 A-1895-15T2
employment." N.J.S.A. 34:19-2(e). "[E]mployer actions that fall

short of [discharge, suspension, or demotion] may nonetheless be

the equivalent of an adverse employment action." Cokus v. Bristol

Myers Squibb Co., 362 N.J. Super. 366, 378 (Law Div. 2002), aff'd,

362 N.J. Super. 245 (App. Div.), certif. denied, 178 N.J. 32

(2003). Actions that negatively affect an employee's

"compensation," "rank," or "terms and conditions of employment,"

can serve as the "functional equivalent of a demotion." Beasley

v. Passaic Cty., 377 N.J. Super. 585, 608 (App. Div. 2005).

 Here, the motion judge observed that after the incident in

which plaintiff had allegedly yelled at a worker at one of

Pinnacle's production plants, the company reclassified plaintiff's

position as an independent contributor. The judge pointed out,

however, that plaintiff's grade level, compensation, and

scientific-work responsibilities remained the same. The only

difference was that subordinates would not report to plaintiff.

 The judge observed that plaintiff had not inquired about the

details of the reclassification, but rejected the position "based

on his personal perception" that the reclassification was a

demotion. The judge stated that there was no objective evidence

supporting plaintiff's "personal perception." The judge also noted

that when plaintiff offered to resign, Album told him to take a

few days "to think things over," while the company investigated

 21 A-1895-15T2
the complaints regarding plaintiff's dealings with other Pinnacle

employees.

 Later, plaintiff met with Album and he was told he could

resign or he would be terminated. Plaintiff chose to resign. The

judge stated that Pinnacle's decision to accept plaintiff's

resignation was not an adverse employment action because plaintiff

had made clear before the meeting that he would never accept the

position of independent contributor.

 The judge commented that plaintiff chose to resign his

position. He made the "unilateral and voluntary determination that

he would never accept the position of independent contributor."

The judge decided that under the circumstances, plaintiff could

not establish that he had been subject to either a constructive

discharge or an adverse-employment action.

 We are convinced that the record supports the motion judge's

determination. Plaintiff failed to show that he was demoted or

otherwise subjected to an adverse employment action. His position

was changed to independent contributor, but he failed to show that

there was any adverse change to his compensation or benefits.

Plaintiff decided he would not accept the reclassification of his

position, and he decided to resign rather than be terminated.

 As the judge pointed out in her decision, not every action

that makes an employee unhappy constitutes an actionable

 22 A-1895-15T2
retaliatory action under CEPA. Nardello v. Twp. of Voorhees, 377

N.J. Super. 428, 434 (App. Div. 2005). Plaintiff claims without

any factual support that his reclassification as an independent

contributor is tantamount to a demotion. Although the record shows

that subordinates would no longer report to him, he failed to show

that the reclassification was, in fact, a demotion.

 Plaintiff also argues that he was offered the opportunity to

either resign or be fired, and that under the circumstances, his

employment was terminated. The record shows, however, that

plaintiff decided he would not under any circumstances accept the

reclassification of his position. As the motion judge determined,

plaintiff voluntarily resigned.

 In view of our decision, we need not consider whether there

is a causal connection between plaintiff's alleged protected

conduct and the alleged retaliatory action, or whether the reasons

Pinnacle gave for the alleged retaliatory action were pretextural.

 Affirmed.

 23 A-1895-15T2